

Carl D. Poplar (CP 4791)
POPLAR & EASTLACK
A PROFESSIONAL CORPORATION
215 Fries Mill Road
Turnersville, NJ 08012
(856) 227-5575

Michael T. Sullivan (MS 3158)
Andrew T. Solomon (AS 9200)
SULLIVAN & WORCESTER LLP
292 Madison Avenue, 6th Floor
New York, NY 10017
(212) 213-8200

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, AMERICAN BANKERS LIFE ASSURANCE COMPANY OF FLORIDA, AMERICAN RELIABLE INSURANCE COMPANY, AND FEDERAL WARRANTY SERVICE CORPORATION, | : : : : : | Civil Action No. *03 - 707* *(KJH)*  **COMPLAINT** |
| Plaintiffs, | : | |
| -against- | : | |
| TRUITT ENTERPRISES, LLC, | : | |
| Defendant. | : | |

Plaintiffs American Bankers Insurance Company of Florida,

American Bankers Life Assurance Company of Florida, American

Reliable Insurance Company, and Federal Warranty Service

Corporation (collectively, "Plaintiffs" or "American Bankers"),

through their attorneys Poplar & Eastlack P.C. and Sullivan &

Worcester LLP, for their Complaint say:

**PARTIES**

1. Plaintiff American Bankers Insurance Company of Florida is a company organized under the laws of the State of Florida, with its principal place of business at 11222 Quail Roost Drive, Miami, FL.

2. Plaintiff American Bankers Life Assurance Company of Florida is a corporation organized under the laws of the State of Florida, with its principal place of business at 11222 Quail Roost Drive, Miami, FL.

3. Plaintiff American Reliable Insurance Company is a corporation organized under the laws of the State of Arizona with its principal place of business at 8655 East Via de Ventura, Scottsdale, AZ.

4. Plaintiff Federal Warranty Service Corporation, is a corporation organized under the laws of the State of Illinois, with its principal place of business at 260 Interstate No. Circle, N.W., Atlanta, GA.

5. Fortis Asset Management, a division of Fortis, Inc., with its offices in New York, NY, is the investment manager for the Plaintiffs.  In a 1999 transaction, Fortis purchased all of the outstanding shares of American Bankers.

6. Defendant Truitt Enterprises, LLC ("Truitt" or "Defendant") is a limited liability company organized under the

laws of the State of Maryland, with its principal place of business at 1526 York Road, Lutherville, Maryland 21093.  On information and belief, the sole and managing member of Truitt is James F. Truitt, Jr., a citizen of Maryland.

### JURISDICTION AND VENUE

7. Jurisdiction is proper pursuant to 28 U.S.C. §1332(a)(1), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

8. Upon information and belief, Defendant is subject to personal jurisdiction in the State of New Jersey.  Truitt maintains sufficient minimum contacts within the State to subject it to *in personam* jurisdiction.

9. Venue is proper pursuant to 28 U.S.C. §1391(a)(2), because the action has been brought in a judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

### FACTS COMMON TO ALL CLAIMS

10.  Plaintiffs are investors in tax liens issued by governmental entities in various jurisdictions.  A tax lien is placed on real property when the owner of the property becomes delinquent on his property or other related taxes (e.g., water and sewer charges).  These tax liens, which are typically

3

evidenced by a certificate (that is, a "tax sale certificate"), are offered for sale by the governmental entities to investors. In some states, the issuing entities are municipalities (as in New Jersey, for example); in others(such as Arizona and New York), the issuers are counties.  Upon purchasing a certificate, the purchaser essentially acquires the rights of the county, municipality or other taxing unit to collect the taxes, interest and penalties.  In most jurisdictions, after a certain statutory period, if a property owner fails to pay the holder of the certificate the amount due, the holder may institute a procedure to foreclose or bar the right of redemption.  That process ultimately vests the certificate holder with a fee simple interest in the underlying property.  All of the above rights are governed by state law.

11.  Typically, the amount a property owner has to pay to payoff a tax lien is called the "redemption amount."  The redemption amount is determined by statute and usually includes the amount the investor paid to acquire the tax sale certificate (the "principal"), interest on the principal at the applicable interest rate ("interest"), plus certain penalties and fees.

12.  Truitt is in the business of acquiring and servicing tax liens for tax lien investors.  In most jurisdictions, tax liens can be acquired by purchasing them at auction or by assignment from a private party or a governmental entity.

4

Servicing a tax lien usually includes recording the tax sale certificate, processing redemptions, paying subsequent taxes and initiating and prosecuting foreclosure actions.

13.   Truitt (or another entity controlled by James Truitt) entered into three successive letter agreements with American Bankers Insurance Group, a trade name which includes Plaintiffs. All three agreements, dated March 15, 1994, May 16, 1997, and December 14, 2000, respectively, were drafted by Truitt.  The last of those agreements, which is in dispute here, is attached hereto as Exhibit A and shall be referred to as the "Agreement."

14.   The Agreement provides in relevant part:

    a. American Bankers retained Truitt as its adviser "in connection with the investment by Plaintiffs in tax lien certificates ("TLCs")."

    b. Truitt was authorized to purchase for American Bankers "a portfolio of up to at least $35 million of TLCs (the "Portfolio")."

    c. Truitt was authorized to service American Bankers' Portfolio subject to the following limitations and guidelines (only relevant provisions set forth below):

        i. "The issuer of all such TLCs shall be a municipality located in New Jersey, Maryland, The District of Columbia, Arizona, Illinois or Indiana, or such other state approved in advance

by [Plaintiffs]."   (Agreement, §2a).   (More than
one-half of the tax liens in the current
Portfolio were purchased at auction by Truitt
from New Jersey municipalities).

ii.   "The principal amount of each TLC redeemed or
liquidated on or before December 31, 2003 shall
be reinvested by [Truitt] ... in TLCs."
(Agreement, §2(b)).

iii.   "The minimum face value yield (including
subsequent taxes and penalties) of any TLC
purchased hereunder shall not be less than the
'hurdle rate' (as defined below) plus 425 basis
points."   (100 basis points equals one percentage
point).   The "hurdle rate" is defined as "the
two-year sequential collateral mortgage
obligation ("CMO"), at the time the TLC is
purchased ...."   As of this week, for example,
according to the Wall Street Journal, the hurdle
rate is 210 basis points over the two-year
treasury bill, which yields 1.7% per annum.   In
other words, the hurdle rate would be about 3.8%,
meaning that Truitt could not purchase any TLC
with a "face yield" less than 8.05%.   (Agreement
§2(f))

d. Regarding the reinvestment of principal, the Agreement
provided that should American Bankers "fail to
reinvest the principal amount of any TLC redeemed or
liquidated on or before December 31, 2003 ...
[Plaintiffs] shall pay to [Truitt] an amount equal to
one percent of such principal amount." (Agreement,
§7(a)).

e. Finally, regarding termination, the Agreement provided
that "[American Bankers] may terminate this agreement
in the event that [Truitt] has breached any material
term of this agreement, including but not limited to,
Section 2." (Agreement §7(b)).

15.   In early 2002, Fortis determined to sell or otherwise
liquidate American Bankers' investment in tax liens.  To that
end, Truitt and American Bankers entered into a commission
agreement, dated March 6, 2002, pursuant to which Truitt could
receive a commission in the event of a successful bulk sale of
the Portfolio.

16.   From March 2002 to date, Fortis expended significant
money and effort to procure the sale of the Portfolio.  By
January 2003, it appeared that the sale would come to fruition:
a tax lien company named TaxServ, LLC had found an interested
buyer.  Under the sale as contemplated, however, Truitt would no
longer act as servicer for the Portfolio.

17.    On information and belief, Truitt realized that the commission he might receive for the sale of the Portfolio would be significantly less than the income he earned under the Agreement as servicer.

18.    In February 2003, aware that Fortis was close to selling the Portfolio, Truitt contacted Fortis demanding that Fortis fund the additional purchase of $1.5 million in tax liens in Maricopa County, Arizona.  Truitt knew, or should have known, that Fortis would not authorize such an extravagant investment: its goal was to liquidate, not expand, its tax lien investment. As was its express right under the Agreement, Fortis refused.

19.    On information and belief, having instigated this "dispute" with American Bankers, James Truitt then contacted principals at TaxServ, warning them not to purchase the Portfolio because he was going to sue American Bankers for breach of the Agreement.  Truitt further threatened, on information and belief, that the lawsuit would thwart any such sale.

20.    There can be no doubt that this calculated act of sabotage by Truitt had a dramatic impact on TaxServ:  The proposal Fortis ultimately received from TaxServ was dramatically inferior to that discussed just days earlier. Moreover, TaxServ demanded that American Bankers agree "to hold [TaxServ] harmless and to indemnify [it] from any claim asserted

8

by Truitt Enterprises, LLC ... with respect to any matter, claim or loss regarding the transaction contemplated."

21.    Truitt also had his counsel send a "Notice of Breach Letter" to Fortis, asserting that American Bankers' refusal to fund the Arizona purchase constituted a breach under the Agreement.  Truitt's counsel further announced that Truitt intended to attend February tax lien auctions in Nassau County, New York and Bayonne, New Jersey.

22.    Truitt's announced intention to purchase additional tax liens prompted Fortis to review the composition of the Portfolio against the requirements of Section 2 of the Agreement.  Its investigation was telling: Truitt had purchased a significant number of tax liens, many issued by municipalities in New Jersey, which yielded, on their face, significantly less than the "minimum face yield" of 425 basis points over the hurdle rate.

23.    As a result of Truitt's numerous material breaches of the Agreement, on or about February 14, 2003, American Bankers terminated the Agreement in accordance with Section 7(b).

## CLAIM I: BREACH OF FIDUCIARY DUTY

24.    Plaintiffs incorporate the allegations in paragraphs 1 to 23, as if set forth in full herein.

25.    Truitt, as an agent for American Bankers, owed it a fiduciary duty.

26.    Without justification, Truitt breached that duty, by interfering with American Bankers' attempt to sell the Portfolio to TaxServ.

27.    American Bankers has been damaged by Truitt's breach of its fiduciary duty in an amount to be determined at trial.

## CLAIM II: BREACH OF CONTRACT

28.    Plaintiffs incorporate the allegations in paragraphs 1 to 27, as if set forth in full herein.

29.    In the letter agreement of March 6, 2002, Truitt agreed to assist American Bankers in the sale of the Portfolio.

30.    Truitt breached that contract, including the implied duty of good faith and fair dealing, by interfering with American Bankers' attempt to sell the Portfolio to TaxServ.

31.    American Bankers has been damaged by Truitt's breach of contract in an amount to be determined at trial.

## CLAIM III: BREACH OF CONTRACT

32.    Plaintiffs incorporate the allegations in paragraphs 1 to 31, as if set forth in full herein.

33.    In the Agreement (that is, the letter agreement dated December 14, 2000), Truitt promised that it would not purchase tax liens with a "face value yield" less than the "hurdle rate"

plus 425 basis points.  Truitt breached that agreement on

multiple occasions by purchasing a substantial number of tax

liens with "face value yields" of less than the stated minimum.

Many of those improper tax lien purchases were made at auctions

conducted by New Jersey municipalities at which Truitt attended.

34.  Truitt's multiple breaches of the Agreement were

material and caused American Bankers to suffer damages in an

amount to be determined at trial.

WHEREFORE Plaintiffs demand judgment against Defendant as

follows:

a. awarding damages in an amount to be determined at trial;

b. directing Truitt to provide all necessary information

required for an orderly transition of the servicing of the

Portfolio to a replacement servicer;

c. directing Truitt to provide an accounting of all fees,

expenses and other profits taken by Truitt under the Agreement;

d. together with costs, attorneys' fees, and such other and

further relief as the Court deems just and necessary.

Dated: February 14, 2003                    POPLAR & EASTLACK
                                            A PROFESSIONAL CORPORATION

                                    By:    _____
                                            CARL D. POPLAR (CP 4791)
                                            215 Fries Mill Road
                                            Turnersville, NJ 08012
                                            (856) 227-5575

                                            Michael T. Sullivan (MS 3158)
                                            Andrew T. Solomon (AS 9200)
                                            SULLIVAN & WORCESTER LLP
                                            292 Madison Avenue, 6th Fl.
                                            New York, NY 10017
                                            (212) 213-8200

                                            Attorneys for Plaintiffs

To:
Truitt Enterprises, LLC
1526 York Road
Luthersville, MD  21093

# EXHIBIT A

Truitt Enterprises, LLC
1526 York Road
Lutherville, Maryland 21093
410-583-9640
Telecopier: 410-583-9644

December 14, 2000

~~Mr. Len~~ Garcia
Senior Vice President and
Chief Investment Officer
Assurant Group
11122 Quail Roost Drive
Miami, Florida 33157-6596

Dear Len:

The purpose of this Letter Agreement is to set forth the terms of the contract between American Bankers Insurance Group, Inc. on behalf of itself and its subsidiaries, American Security Insurance Company, Standard Guaranty Insurance Company and Union Security Life Insurance Company (hereinafter referred to individually and collectively as Assurant Group ("A.G.") and Truitt Enterprises, LLC ("T"), relating to the investment by "A.G." in tax lien certificates. This letter agreement is to be effective January 1, 2001.

1.    Retention as Adviser. "A.G" hereby retains "T" as "A.G.'s" adviser, and "T" hereby agrees to serve as "A.G.'s" adviser, in connection with the investment by "A.G." in tax lien certificates ("TLCs"), pursuant to the terms hereof. "A.G." understands and acknowledges that "T" has made no guarantees or assurances as to the performance of "A.G.'s" investments hereunder. "A.G." further acknowledges that it understands the risks attendant to investing in TLCs.

2.    Authorization; Investment Guidelines. "T" is hereby authorized, on behalf of "A.G.", without obtaining the consent of or consulting with "A.G." or any other person, to purchase a portfolio of up to ~~at least $35 million~~ of TLCs (the "Portfolio"), to service such Portfolio, and to take all actions necessary and appropriate to redeem or otherwise liquidate such TLCs, subject to the following limitations and guidelines:

a)    The issuer of all such TLCs shall be a municipality located in New Jersey, Maryland, the District of Columbia, Arizona, Illinois or Indiana, or such other state approved in advance by "A.G".

b)    The principal amount of each TLC redeemed or liquidated on or before December 31, 2003 shall be reinvested by "T", on behalf of "A.G.", in TLCs. Interest on TLCs redeemed or liquidated on or before December 31, 2003 shall be retained by "A.G.". The principal amount and interest on TLCs redeemed or liquidated after December 31, 2003 shall be retained by "A.G." Notwithstanding the foregoing to the contrary, "T", in its sole discretion, may decide not to reinvest the principal amount of any TLC redeemed or liquidated on or before December 31, 2003 if market conditions would render such reinvestment imprudent for "A.G." and/or "T".

Mr. Len Garcia
December 14, 2000
Page two

_____

     c)     The aggregate amount of TLCs in the Portfolio at any time with a principal amount between $100,000 and $300,000 shall not exceed $2 million.

     d)     No TLC purchased hereunder shall exceed $300,000 in principal amount.

     e)     No TLC purchased hereunder shall have a lien to property value ratio in excess of 20%.

     f)     The minimum face value yield (including subsequent taxes and penalties) of any TLC purchased hereunder shall not be less than the "hurdle rate" (as defined below) plus 425 basis points.

     g)     TLCs may be purchased on residential, commercial and unimproved properties; provided, however, that "T" shall not purchase any TLCs on commercial properties which "T" has actual notice, through the exercise of reasonable due diligence, of any potential environmental problems. Examples of commercial properties with potential environmental problems are vacant gas stations and industrial sites with chemical storage facilities.

     h)     "T" shall not take title to any property underlying a TLC, on behalf of "A.G.", if the cost to take title exceeds 60% of the then current appraised value of such property. In any such case in which "T" is prohibited from taking title to a property on behalf of "A.G.", and "T" in its discretion has determined that the TLC in question is uncollectible, "T", at its option, may purchase the TLC in question from "A.G.". The purchase price shall be equal to the principal amount of such TLC, plus accrued interest to the date title is taken thereon, plus all direct costs expended by "A.G." in connection with such TLC. The accrued interest portion of such purchase price shall not be paid by "T" until "T" has completed the liquidation of the underlying property. If "T" does not exercise such option, the principal amount of the TLC in question shall be charged against the applicable reserve established under Paragraph 6 (b) (i) below.

     i)     "T" shall not permit any bidder employed or otherwise engaged by "T" to engage in any activities that could lead to a charge of collusion. For the purposes of this agreement, "collusion" shall mean reaching or seeking to reach agreements or understandings with other tax lien purchasers relating to rates to bid or who will win the bid at auctions. "T" represents and warrants that neither "T" nor its agents or employees shall (i) enter into discussions with other bidders about their bids or strategy; (ii) agree with other bidders on the specific interest rates to be bid, (iii) agree with other bidders on a floor interest rate below which they will not bid, (iv) agree with other bidders as to which liens they will make bids on and which they will not bid on and (v) engage in any activities that could lead to a charge of collusion. "T" represents and warrants that during the term of this agreement, "T" shall maintain the policy that any bidder employed or

Len Garcia
July 17, 2000
Page three

---

otherwise engaged by "T" who violates its "anti-collusion" policy shall be immediately dismissed.

"A.G." shall execute all customary documents necessary to enable "T" to perform its responsibilities hereunder, including, without limitation, any documents evidencing "T"s authority to act on behalf of and bind "A.G."

3. <u>Services to be Provided by "T"</u>. During the term hereof, "T" shall provide the following services relating to all TLCs held in the Portfolio:

    a)    Acquisition of TLCs.

        i.    All negotiations with municipal governments.
        ii.    Attendance at public auction sales.
        iii.    Electronic criteria establishment through TRW and local databases.
        iv.    On site inspection and market analysis.
        v.    Lien searches on TLCs with a principal amount over $50,000.
        vi.    Title searches on TLCs with a principal amount over $100,000.

    b)    Servicing of TLCs.

        i.    Data-base management of the Portfolio.
        ii.    Required filings and registrations.
        iii.    Release/assignment preparation.
        iv.    Collection procedures, as required in "T"s discretion, to include mail notice, telephone contact, notice posting, etc.
        v.    Negotiations with property owners, banks and other lien holders/creditors.
        vi.    Retention of counsel and oversight and review of all legal actions. "A.G." understands and acknowledges that James F. Truitt, Jr., President of "T", may be retained as counsel to represent "A.G." in connection with the redemption of a TLC or the foreclosure of an underlying property.

    c)    Reporting to "A.G."
        i.    Monthly reconciliations of the Portfolio. ✓
        ii.    Quarterly profit/loss statements on a cash and accrual basis.

4.    ▬▬▬▬▬▬▬During the term hereof, "A.G." shall be responsible for the following:

Mr. Len Garcia
December 14, 2000
Page four

a)    Storage of original TLCs.
b)    Endorsement of TLCs, releases and assignments, as required.
c)    Bank account reconciliations.
d)    Accounting and tax matters relating to the Portfolio (except as enumerated in Section 3 above).

5.    <u>Expense Allowances; Costs.</u>  (a)  "A.G." shall pay to "T", monthly in arrears, (i) 1.5% of the amount of all TLCs purchased during each month, to cover acquisition expenses; and (ii) .0625% of the aggregate principal amount of the TLCs in the Portfolio on the last day of each month, to cover servicing costs.  Such expense allowances are payable within thirty days of the end of each month.  In the event of termination, such allowances shall be paid upon termination and, in the case of servicing costs under subparagraph (ii) above, shall be pro rated if the termination date is not the last day of a month.

(b)  "A.G." shall be responsible to pay all costs associated with the responsibilities enumerated in paragraph 4 above.  Such costs shall be deemed to be .03% per month of the aggregate principal amount of the TLCs in the Portfolio on the last day of each month, pro rated in the event of termination on a date which is not the last day of a month.



(c)  "A.G." shall pay directly <u>100% of all expenses which attach to a TLC, including, without limitation, fees and expenses of attorneys, title companies, process servers and auctioneers, and court costs.</u>  In the event that "T" advances any such expenses on behalf of "A.G.", "A.G." shall immediately reimburse "T" therefor upon presentation to "A.G." of an invoice.

6.    <u>Profit Sharing.</u>  (a)  The "hurdle rate" for each TLC means the yield on a two-year sequential collateral mortgage obligation ("CMO"), at the time the TLC is purchased, times a fraction, the denominator of which is 365 and the numerator of which is the number of days from and including the date the TLC is purchased through the date the TLC is redeemed or liquidated.  The yield on a two-year CMO shall be as published in <u>The Wall Street Journal.</u>  If such yield is published as a spread over the yield on U.S. Treasury securities, the yield on such securities also shall be as published in <u>The Wall Street Journal.</u>

The term "profit" as to each TLC means the amount received upon redemption or liquidation of such TLC, minus the purchase price of such TLC, and minus the expense allowances and costs enumerated in paragraph 5 above relating to such TLC.

The term "TLC Traunch" or "Traunch" means all TLCs purchased at the same time and at the same auction or private sale.

Mr. Len Garcia
December 14, 2000
Page five

---

(b)    The profit on each TLC shall be allocated and paid as follows:

  i.     First, to be held in reserve by "A.G.", an amount equal to
         an annualized return on the principal amount of such TLC
         equal to 1.0%.

  ii.    Next, to "A.G.", the amount, if any, by which the aggregate
         amount charged against the reserve to which such TLC
         belongs exceeds such reserve.

  iii.   Next, to "A.G.", an amount equal to an annualized return
         on the principal amount of such TLC equal to the hurdle
         rate plus 1.25%.

  iv.    Next, to "T", an amount equal to an annualized return on
         the principal amount of such TLC equal to 1.25%; and

  v.     The balance to be shared equally by "A.G." and "T".

Within thirty days of the last day of each month during the term hereof, "A.G." shall pay
to "T" its share of the profits on all TLCs redeemed or liquidated during such quarter.
Upon termination hereof, "A.G." shall pay to "T" its share of profits on all TLCs
redeemed or liquidated during the period from the end of the immediately preceding
calendar quarter through the date of termination.

(c)    Each TLC Traunch shall have a separate reserve established under
paragraph 6 (b) above. Each such reserve shall be distributed at such time as all TLCs in
the Traunch have been redeemed, liquidated or deemed by "T" to be uncollectible (such
time referred to as the "Distribution Date"), as follows:

  i.     First, to "A.G.", to the extent that the profits on any TLC in
         such TLC Traunch realized by "A.G." are less than the
         amounts enumerated in paragraph 6 (b) (iii) above;

  ii.    Next, to "T", to the extent that the profits on any TLC in
         such TLC Traunch realized by "T" are less than the
         amount enumerated in paragraph 6 (b) (iv) above; and

  iii.   The balance to be shared equally by "A.G." and "T".

Mr. Len Garcia
December 14, 2000
Page six

_____

       Within thirty days of the Distribution Date for each reserve, "A.G." shall pay to "T" its share of such reserve. Upon termination hereof, "A.G." shall pay to "T" its share of all previously undistributed reserves.

       (d)    "A.G." shall not be responsible to pay any fees to anyone other than "T".

       7.    (a)    <u>Term.</u> This agreement shall terminate thirty days after all of the TLCs purchased hereunder are redeemed, liquidated or, in "T"s sole discretion, have become uncollectible. ▓▓▓▓▓▓▓▓ that "A.G." fails to reinvest the principal amount of any TLC redeemed or liquidated on or before December 31, 2003 in accordance with the terms of paragraph 2 (b) above, "A.G." shall pay to "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓"

       (b)    "A.G." may terminate this agreement in the event that "T" has breached any material term of this agreement, including but not limited to, Section 2.

       8.    <u>Miscellaneous.</u> This agreement represents the entire agreement between "A.G." and "T" relating to the subject matter hereof. This agreement may be amended only in writing signed by "A.G." and "T". This agreement shall be governed by the laws of the State of Maryland. This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

       Please indicate your agreement to the terms hereof by signing below.

       Sincerely,

       Agreed to:

TRUITT ENTERPRISES, LLC

By: _____
    James F. Truitt, Jr.
    President

AMERICAN BANKERS INSURANCE GROUP, INC. & SUBSIDIARIES

By: _____
    Arthur Heggen
    Corporate Secretary

AMERICAN SECURITY INSURANCE COMPANY

By: _____
    Arthur Heggen
    Assistant Secretary

Case 1:03-cv-00527-CCB    Document 9-3    Filed 03/19/2003    Page 20 of 20

Mr. Len Garcia
December 14, 2000
Page seven

STANDARD GUARANTY INSURANCE
COMPANY

By: _____

Arthur Heggen
Assistant Secretary


UNION SECURITY LIFE INSURANCE
COMPANY

By: _____

Arthur Heggen
Assistant Secretary