**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
– Northern Division –

TRUITT ENTERPRISES, LLC, *et al.*,    )
    )
               Plaintiffs,    )
    )
        v.    )     Civil Action No. CCB 03-527
    )
FORTIS, INC., *et al.*,    )
    )
               Defendants.    )
_____)

**<u>PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS</u>**

William J. Murphy (#00497)
John J. Connolly (#09537)
MURPHY & SHAFFER
Suite 1400
36 South Charles Street
Baltimore, Maryland 21201
(410) 783-7000
(410) 783-8823 (fax)

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.  Fortis's Claims In New Jersey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      2.  TE's and JFT's Claims In Maryland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  A.  Rule 13 Does Not Apply Because TE Has Moved To Dismiss
The New Jersey Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  B.  Fortis's Bad-Faith Sandbagging, Combined With The Balance Of
Convenience Of The Parties, Warrants An Exception To The Compulsory
Counterclaim Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.  The First-Filed Rule Does Not Apply Where The Cases
Were Filed At Or About The Same Time . . . . . . . . . . . . . . . . . . . . . . . . . 15

      2.  The Equitable Exceptions To The First-Filed Rule Apply
In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      3.  Fortis's Choice Of A New Jersey Forum Is Entitled To No
Weight In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      4.  The Balance Of Convenience Favors Adjudication In
Maryland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

  C.  The Court Should Not Dismiss Fortis, Inc. As A Party Defendant . . . . . . . . . . . . . . 24

      1.  Fortis, Inc. Adopted The Contract And Is Bound By Its Terms . . . . . . . . . . . . 24

      2.  Alternatively, Fortis May Have Acquired The Liabilities
Of Its Subsidiary Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

  D.  JFT Is A Proper Plaintiff Because It Is A Third-Party Beneficiary
To The December 2000 Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

**<u>Cases</u>:**

*Affinity Memory & Micro, Inc.* v. *K&Q Enters., Inc.,* 20 F. Supp. 2d 948
    (E.D. Va. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Alltrade, Inc.* v. *Uniweld Prods., Inc.,* 946 F.2d 622 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 16

*Benton* v. *England,* 222 F. Supp. 2d 728 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Chicago Title Ins. Co.* v. *Lumbermen's Mutual Casualty Co.,* 120 Md. App. 538,
    707 A.2d 913 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*College of Notre Dame, Inc.* v. *Morabito Consultants, Inc.,* 132 Md. App. 158,
    752 A.2d 265 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*CSR Ltd.* v. *Federal Ins. Co.,* 141 F. Supp. 2d 484 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . 17

*EEOC* v. *University of Pa.,* 850 F.2d 969 (3d Cir. 1988), *aff'd,* 493 U.S. 182 (1990) . . . . . 16, 18

*Ellicott Mach. Corp.* v. *Modern Welding Co.,* 502 F.2d 178 (4th Cir. 1974) . . . . . . . . . . . . . . . 15

*First Nationwide Mortgage Corp.* v. *FISI Madison, LLC,* 219 F. Supp. 2d 669
    (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Flaherty* v. *Weinberg,* 303 Md. 116, 492 A.2d 618 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Froelich* v. *Erickson,* 96 F. Supp. 2d 507 (D. Md. 2000), *aff'd,* 2001 W.L. 256080
    (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Geo. Byers Sons, Inc.* v. *East Europe Import Export, Inc.,* 488 F. Supp. 574
    (D. Md. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Helsel* v. *Tishman Realty & Constr. Co.,* 198 F. Supp. 2d 710 (D. Md. 2002) . . . . . . . . . . . . . 19

*Horn & Hardart Co.* v. *National Railroad Passenger Corp.,* 843 F.2d 546 (D.C. Cir.),
    *cert. denied,* 109 S. Ct. 129 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hyatt Int'l Corp.* v. *Coco,* 302 F.3d 707 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Internet Law Library, Inc.* v. *Southridge Capital Mgmt, LLC,* 208 F.R.D. 59
    (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kann* v. *Kann,* 344 Md. 689, A.2d 509 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kerby* v. *Mortgage Funding Corp.,* 992 F. Supp. 787 (D. Md. 1998) . . . . . . . . . . . . . . . . . . . . 23

*Lengacher* v. *Reno,* 75 F. Supp. 2d 515 (E.D. Va. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*LG Elecs., Inc.* v. *First Int'l Computer, Inc.,* 138 F. Supp. 2d 574 (D.N.J. 2001) . . . . . . . . . . . 17

*Lynch* v. *Vanderhoef Builders,* 237 F. Supp. 2d 615 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . 17

*Mellon Bank, N.A.* v. *Ternisky,* 999 F.2d 791 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nall* v. *Piper,* 1991 W.L. 192141 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*National Union Fire Ins. Co.* v. *Jett,* 118 F.R.D. 336 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . 13

*Ontel Prods.* v. *Project Strategies Corp.,* 899 F. Supp. 1144 (S.D.N.Y. 1995) . . . . . . . . . . 15, 18

*Pennsylvania Mfrs. Ass'n Ins. Co.* v. *Federal Realty Investment Trust,*
    2000 WL 964771 (D. Md. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Porter* v. *General Boiler Casing Co.,* 284 Md. 402, 396 A.2d 1090 (1979) . . . . . . . . . . . . 25-26

*Potter* v. *Carvel Stores, Inc.,* 203 F. Supp. 462 (D. Md. 1962),
    *aff'd,* 314 F.2d 45 (4th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schultz* v. *Ary,* 175 F. Supp. 2d 959 (W.D. Mich. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Shofer* v. *Stuart Hack Co.,* 124 Md. App. 516, 723 A.2d 481,
    *cert. denied,* 354 Md. 331, 731 A.2d 440 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Smithers-Oasis Co.* v. *Clifford Sales & Marketing,* 194 F. Supp. 2d 685
    (N.D. Ohio 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Snider Bros., Inc.* v. *Heft,* 271 Md. 409, 317 A.2d 848 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 26

*Southern Union Co.* v. *Southwest Gas Corp.,* 165 F. Supp. 2d 1010 (D. Ariz. 2001) . . . . . . . . 15

*Stone Creek Mechanical, Inc.* v. *Carnes Co., Inc.,* 2002 W.L. 31424390,
    (E.D. Pa. Oct. 25, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Swedish Civil Aviation Admin.* v. *Project Mgmt. Enters., Inc.,* 190 F. Supp. 2d 785
    (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Snider,* 779 F.2d 1151 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Volcjak* v. *Washington County Hosp. Ass'n,* 124 Md. App. 481, 723 A.2d 463,
     *cert. denied,* 354 Md. 115, 729 A.2d 406 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Westinghouse Elec. Corp.* v. *United States,* 598 F.2d 759 (3d Cir. 1979) . . . . . . . . . . . . . . . . 19

## **Statutes and Rules:**

Fed. R. Civ. P. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 45(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1391(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1391(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. § 1404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
– Northern Division –

| | | |
|---|---|---|
| TRUITT ENTERPRISES, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. CCB 03-527 |
| | ) | |
| FORTIS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Plaintiffs Truitt Enterprises, LLC ("TE") and James F. Truitt Jr., P.A. ("JFT"), by their undersigned attorneys, hereby oppose the motion to dismiss filed by defendants Fortis, Inc., American Bankers Insurance Group, Inc., and American Security Insurance Co. (collectively, "Fortis").

## INTRODUCTION

TE is a Maryland company that manages investments in municipal tax liens, and is the longtime servicer for a portfolio of tax-lien investments held by Fortis, an international insurance conglomerate with $400 billion in assets. Under the parties' written contract, TE has sole discretion to invest up to $35 million of Fortis's funds purchasing tax liens for Fortis's account. TE's principal, James F. Truitt Jr., is an attorney and his law firm (plaintiff JFT) represents Fortis in Maryland in many of the redemption, foreclosure and related legal proceedings involved in tax-lien management.

In late January 2003, Fortis indicated that it would no longer fund the purchase of new tax liens by TE, a blatant violation of the parties' written contract. On Monday, February 10, 2003, after Fortis failed to fund a specific tax-lien purchase, TE's counsel duly notified Fortis of its

breach.  On Thursday, February 13, Fortis's counsel informed TE's counsel that he expected the parties would be able to resolve their differences, and he asked that TE refrain from filing suit so Fortis could respond.  Monday, February 17, was a federal holiday, and also the second day of the "President's Day Blizzard" that closed state courts on Tuesday and Wednesday as well.  On Tuesday, February 18, Fortis's outside counsel faxed a letter to TE's counsel purporting to terminate the parties' contract for unspecified reasons; Fortis did not mention that it filed a Complaint in the District of New Jersey that same day, consisting of hastily assembled "information and belief" claims that had never been the subject of dispute or even discussion between the parties.  In response to Fortis's letter, TE prepared the Complaint in this action, which was filed on Thursday, February 20, in the Circuit Court for Baltimore County, Maryland, the next open business day in that Court.  TE informed Fortis of the Baltimore County suit on February 21; only then did Fortis tell TE that it had filed suit in the District of New Jersey on February 18.

Fortis's sandbagging was an obvious attempt to establish an inconvenient venue for TE, a small company whose only office is in Lutherville.  In its haste to file a Complaint, however, Fortis had no time to investigate its claims, and the substantive allegations of the Complaint are groundless and, based on TE's investigation at this time, probably frivolous.  Moreover, TE has moved to dismiss Fortis's New Jersey Complaint for improper venue, or alternatively to transfer it to this Court so the Fortis entities can pursue it as a counterclaim – if they choose to do so after they have conducted a proper investigation of their claims.[1]

---

[1] The issues in this Opposition overlap in large measure the issues presented by TE's motion to dismiss in the New Jersey action, and much of this Memorandum is an edited version of the Memorandum TE filed in New Jersey.  A complete copy of TE's New Jersey Memorandum is attached hereto as Exhibit A.  The two declarations TE filed in New Jersey are equally pertinent to this Opposition and are attached hereto as Exhibit B (Declaration of James F. Truitt Jr.), and Exhibit

## STATEMENT OF MATERIAL FACTS

TE manages investments in tax liens for institutional investors like Fortis. Ex. B (Declaration of James F. Truitt Jr.), at ¶¶ 1-2. Tax-lien managers research municipal property-tax rolls and purchase delinquent tax bills on suitable properties, in return for tax lien certificates, or "TLCs," from the municipal taxing authorities. *Id.* at ¶ 2. The municipal authorities fully support tax liens as an investment vehicle, because purchases by large investors bolster property tax revenues and help reduce delinquent property tax rolls. *Id.* After buying a TLC from a municipality, TE attempts to collect penalties and interest prescribed by statute in various jurisdictions from an interested party, such as a mortgagee or property owner, much as a municipality would do if it had the time, resources, and expertise. Alternatively, TE forecloses on the encumbered property and recoups its investment from subsequent sale proceeds. *Id.* After paying expenses for lawyers, title-searchers, and the like, TE returns to the institutional investor the majority of the proceeds from the TLC, and TE retains agreed-upon amounts in fees and profit. Mr. Truitt, through his law firm JFT, represents Fortis in Maryland TLC proceedings. *Id.* at ¶¶ 2-3.

Since approximately 1994, TE's principal client has been American Bankers Insurance Group ("ABIG") and related entities that became known collectively as the Assurant Group after Fortis acquired ABIG in late 1999. Ex. B, at ¶ 4. The parties operate under a written contract dated December 14, 2000, a copy of which was attached as Exhibit A to plaintiffs' Complaint in this matter. Under this "December 2000 Agreement," Assurant Group retained TE as

---

C (Declaration of William J. Murphy). (Exhibit 4 to the Murphy Declaration was the Complaint filed in this action and has been omitted as unnecessary in the filing in this Court.) A Second Declaration of Mr. Truitt, addressing some of the particular arguments raised in Fortis's Motion, is attached hereto as Exhibit D.

its "adviser, in connection with the investment by [Assurant Group] in [TLCs], pursuant to the terms hereof." The Agreement explicitly provides that TE "is hereby authorized, on behalf of [Assurant Group], *without obtaining the consent of or consulting with [Assurant Group] or any other person*, to purchase a portfolio of up to at least $35 million of TLCs (the "Portfolio"), to service such Portfolio, and to take all actions necessary and appropriate to redeem or otherwise liquidate such TLCs," subject to stated limitations and guidelines. Compl. Ex. A, at 1 (emphasis added). TE has performed its obligations under the December 2000 Agreement (and predecessor agreements), and year after year the Portfolio generated above-market returns for Fortis. Ex. B, at ¶ 4.

Nevertheless, in late November 2001, shortly after Fortis began actively managing this investment for the Assurant Group, Fortis employees claimed that they were free to withhold funds from TE for the purchase of new tax liens, thereby reducing the size of the existing Portfolio substantially below $35 million, subject only to a contractual penalty of one percent of the difference between $35 million and the reduced principal amount of the Portfolio. Ex. B (Truitt Decl.), at ¶ 5. In December 2001, the parties and their counsel met at Fortis's offices in New York City to discuss these issues. *Id.* During that meeting, Fortis acknowledged that TE had a contractual right to purchase new tax liens on ABIG's behalf through December 2003, but asked TE to develop a term sheet for the early termination of the contract and the sale of the existing portfolio. *Id.* The purpose of the term sheet was to compensate TE and Mr. Truitt for the fees that would be lost as a result of the early termination of the Agreement, and also to provide TE with incentives, in the form of a commission, to assist Fortis in the early sale of the existing portfolio. *Id.*

In early December 2001, TE delivered a proposed term sheet to Fortis. Ex. B, at ¶ 6. The parties could not agree on the provisions of the term sheet, however, and on January 11,

2002, TE sent Fortis a formal notice that ABIG and the Assurant Group were in breach of the December 2000 Agreement because of Fortis's refusal to provide TE with $35 million in Portfolio funding. *Id.*; *see also* Ex. C (Declaration of William J. Murphy), at ¶ 2.  TE asked Fortis to cure the breach by January 18, 2002.  Ex. B (Truitt Decl.), at ¶ 6.  Fortis requested further negotiations and, during a meeting between the parties on January 23, 2002, Fortis's representatives agreed to continue in effect the existing terms of the December 2000 Agreement. *Id.*; *see also* Ex. B(1).  In addition, at Fortis's request TE prepared a commission agreement that would compensate TE in the event of a bulk sale of the Portfolio before the termination of the December 2000 Agreement. *Id.* That "Commission Agreement" was executed by the parties on March 6, 2002, and was expressly incorporated into the parties' December 2000 Agreement.  Compl. Ex. B.

By December 2002, Mr. Truitt had located a serious bidder for the entire Portfolio. Ex. B, at ¶ 7.  The bidder was represented by an entity named TaxServ LLC, located in McLean, Virginia.  Under TaxServ's working concept for a bid, TE was expected to continue as the servicer of the Portfolio after the sale, and TE also anticipated receiving a substantial commission from Fortis under the Commission Agreement. *Id.* at ¶ 7 & Ex. 2.

At about the same time, Fortis began delaying payments of TE's outstanding invoices, and again began raising questions about TE's ability to purchase new tax liens up to the $35 million level that was authorized by the parties' contract. *Id.* at ¶ 8.  In early February 2003, Fortis refused to fund a specific investment of $1.5 million for new TLCs from Maricopa County, Arizona, even though the principal amount of the Portfolio balance was approximately $28 million at the time – well within the $35 million cap – and even though the Fortis Portfolio Manager had recently acknowledged that TE had a contractual right to purchase the Maricopa County TLCs. *Id.*

5

at ¶ 9. Fortis's conduct not only breached the December 2000 Agreement, it also threatened to make the Portfolio less attractive and less valuable to potential bidders. TE's inability to purchase new liens was a material development that Portfolio bidders had a right to know, and Mr. Truitt informed TaxServ about the issue. *Id.*

On February 10, 2003, TE's counsel sent a Notice of Breach Letter to Mr. Brinkerhoff of Fortis. Ex. C, at ¶ 7 & Ex. C(2). That letter asked Fortis to reconsider its position forthwith, to abide by the contractual commitments in the December 2000 Agreement, and to provide TE with written assurances by February 14, 2003, that it would continue to fund the purchase of new tax lien certificates by TE at two upcoming sales. *See* Ex. C(2).

On Thursday, February 13, 2003, TE's counsel received a telephone call from Mr. Sheehan, in-house counsel for Fortis. Ex. C, at ¶ 8. Mr. Sheehan explained that TE's Notice of Breach letter "struck like a thunderclap" at Fortis and that the matter was being reviewed by high-ranking officials of Fortis's corporate parent in the Netherlands. *Id.* Mr. Sheehan claimed that Fortis's response to the Notice of Breach was delayed by the need to translate the February 10 letter into Dutch. Mr. Sheehan assured TE's counsel that Fortis was not ignoring the Notice of Breach, but that it might take another day or two beyond February 14 to respond to it. *Id.* He urged TE to take no legal action until Fortis was able to respond to the Notice of Breach. He also stated: "As you know from our past dealings, these things have a way of working themselves out." *Id.* TE's counsel told Mr. Sheehan that he would inform Mr. Truitt of his message, that he was certain TE would await further word from Fortis before taking legal action, and that he hoped the parties would be able to come to an understanding of their obligations, as they had in the past. *Id.*

Monday, February 17, 2003, was a federal holiday, and also the second day of the storm that set a record for snowfall (28") in this area. Ex. C, at ¶ 9. On Tuesday, February 18, TE's counsel received a facsimile from Michael Sullivan, acting as outside counsel for Fortis and ABIG. *Id.* at ¶ 9 & Ex. C(3). In that letter, Fortis's new counsel informed TE's counsel that Fortis was giving notice to TE of termination of the December 2000 Agreement for an unspecified material breach. Ex. C(3). The letter also directed TE to begin arranging for the orderly transfer of its Portfolio servicing functions to an unnamed "replacement servicer." *Id.* Within an hour of receiving this facsimile, Mr. Sheehan called TE's counsel and, after expressing surprise that he would be in the office because of the snowstorm, apologized for not calling in advance of Mr. Sullivan's February 18 letter. Ex. C, at ¶ 9. Mr. Sheehan indicated, once again, that the parties might be able to resolve the issues. Mr. Sheehan did not inform TE's counsel that Mr. Sullivan had filed, or was preparing to file on that day, the Complaint in the New Jersey action. *Id.*

Given the tenor of the notice of termination sent by Fortis on February 18, 2003, TE prepared a Complaint to be filed in the Circuit Court for Baltimore County, Maryland, seeking declaratory relief with respect to the parties' rights and obligations under the December 2000 Agreement, and seeking damages in the event that Fortis carried through with its threat to terminate the contract. TE's Complaint was filed on February 20, 2003, the first day the Circuit Court reopened for business after the storm. Ex. C, at ¶ 10.

On February 21, 2003, TE's counsel telephoned Andrew Solomon, Mr. Sullivan's associate, to provide him with information Fortis had requested concerning the transfer of servicing responsibilities from TE to Fortis's "new servicer." Ex. C, at ¶ 11. Mr. Solomon stated that Fortis had not yet selected a new servicer for the Portfolio. *Id.* TE's counsel also informed Mr. Solomon

7

that TE had filed suit against Fortis and the Assurant Group entities on February 20, 2003, and would be serving the defendants that day. *Id.* Mr. Solomon then informed TE's counsel that the Fortis entities had sued TE in federal court in New Jersey, that the suit had been filed "on the day of the snowstorm," and he asked whether counsel would accept service for TE. *Id.* TE's counsel told Mr. Solomon that he believed TE had been sandbagged by Mr. Sheehan, who had urged TE on February 13 not to file suit, because of an apparent strategic ploy on the part of Fortis to sue TE first in a jurisdiction that was inconvenient for TE. *Id.*

### 1.    Fortis's Claims In New Jersey.

The Complaint Fortis filed in New Jersey contains three counts. Count 1 (breach of fiduciary duty) and Count 2 (breach of contract) both claim that TE interfered with Fortis's attempt to sell the Portfolio by allegedly "sabotag[ing]" an expected bid from TaxServ. Fortis alleges that Mr. Truitt realized, "[u]nder the sale as contemplated," that "TE would no longer act as servicer for the Portfolio." *See* Fortis Ex. A (New Jersey Complaint), at ¶ 16. "Upon information and belief," Fortis alleges, "[TE] realized that the commission [it] might receive for the sale of the Portfolio would be significantly less than the income [it] earned under the Agreement as servicer." *Id.* ¶ 17. Fortis claims that Mr. Truitt "instigated" the dispute over the Maricopa County liens and then "contacted principals at TaxServ, warning them not to purchase the Portfolio because he was going to sue [Fortis] for breach of the Agreement," and that "the lawsuit would thwart any such sale." *Id.* ¶ 19.

These claims are completely false, as Fortis would have known had it conducted even a minimal investigation before racing to file a baseless Complaint in an attempt to establish an unfavorable venue for TE. TE always expected to remain as servicer if TaxServ's principal

purchased the Portfolio. Ex. B, at ¶ 7. Indeed, on February 6, 2003, TaxServ delivered to TE a draft of a detailed term sheet that would have set forth the terms and conditions of TE's work as servicer following a purchase by TaxServ. Ex. B(2). Moreover, TE never tried to convince TaxServ not to bid on the Portfolio; on the contrary, TE continuously tried to persuade TaxServ to present a bid, including after Fortis informed TE that it would not fund the purchase of new liens. Ex. B (Truitt Decl.), at ¶ 10. TE believes that TaxServ will confirm these facts, *id.*, and that Fortis did not ask TaxServ about the pertinent allegations before Fortis filed its Complaint.

Count 3 of Fortis's Complaint alleges that TE breached a specific provision in the December 2000 Agreement known as the "face value yield" provision. The parties' Agreement gave TE sole discretion to purchase liens on behalf of Fortis up to a maximum of $35 million, but imposed certain "guidelines and limitations" upon TE's purchases. One such guideline stated that the "minimum face value yield (*including subsequent taxes and penalties*) of any TLC purchased hereunder shall not be less than the 'hurdle rate' (as defined below) plus 425 basis points." Compl. Ex. A, at ¶ 2(f) (emphasis added). The "hurdle rate" is essentially defined to equal the yield on a two-year sequential collateral mortgage obligation ("CMO") as published in the Wall Street Journal. *See id.* ¶ 6. Thus, Fortis wanted TE to purchase TLCs whose face value would exceed the yield on CMOs, a safer investment, by 4.25 percent. As Fortis alleges in its Complaint,

> As of this week, for example, according to the Wall Street Journal, the hurdle rate [*i.e.*, the yield on a two-year CMO] is 210 basis points over the two-year treasury bill, which yields 1.7% per annum. In other words, the hurdle rate would be about 3.8%, meaning that Truitt could not purchase any TLC with a "face yield" less than 8.05%.

Compl. ¶ 14(c)(iii).

9

Fortis claims that TE's "announced intention to purchase additional tax liens prompted Fortis to review the composition of the Portfolio against the requirements of Section 2 of the Agreement." Compl. ¶ 22. Left unsaid is the reason why Fortis undertook this review, but it is obvious now that Fortis was trying to concoct some basis for alleging that TE had breached the contract. If Fortis employees had spent ten minutes on the telephone with Mr. Truitt rather than rushing to accuse him of improprieties, they would have discovered that their allegation is completely baseless.

As set forth in Mr. Truitt's first Declaration, the TLCs issued by New Jersey municipalities have a "minimum face value yield" as defined in the parties' Agreement that is very different from the *interest rate* paid on a TLC. *See* Ex. B (Truitt Decl.), at ¶ 11. The interest rate often is less than the hurdle rate plus 425 basis points. This is not a surprise to Fortis; it receives a copy of each TLC, and each includes the pertinent interest rate. *Id.* But the December 2000 Agreement defines "minimum face value yield" to include "subsequent taxes and penalties," and these are the major sources of earnings for investors in New Jersey TLCs (indeed, many New Jersey TLCs are sold with a principal interest rate of zero). In general, the purchaser of a New Jersey TLC has the right to pay any "subsequent taxes" that have accrued on the underlying property; *i.e.*, taxes that accrue or have accrued after the TLC is sold. *Id.* at ¶ 12. New Jersey law allows the TLC holder who pays these subsequent taxes to recover 18 percent interest on the subsequent taxes. *Id.* In addition, New Jersey law permits a TLC holder to recover substantial penalties from the redeeming party. Thus, if TE purchases a $3000 tax lien at zero percent interest with $3000 in taxes due in 10 days, TE will timely pay the "subsequent taxes" and the effective interest rate on that TLC becomes nine percent. In addition, a party wishing to redeem the TLC will have to pay TE a penalty

10

which ranges from two to six percent on the certificate amount; in this example two percent would be the likely figure. *See id.* Thus, if the TLC is redeemed exactly one year after purchase, then the yield would be 11 percent – far above the threshold set forth in the parties' Agreement. And if the TLC is redeemed two weeks after purchase, the face value would be considerably higher, because the two percent penalty remains the same. *Id.* Certain New Jersey jurisdictions also provide for an additional year-end "penalty" of six percent charged to a taxpayer whose delinquency exceeds $10,000 at the end of a fiscal year, which further increases the yield.

To ensure that it would meet and exceed the "minimum face value yield" for New Jersey TLCs, TE hired a professor of economics at the University of Delaware to write a sophisticated (and proprietary) computer program modeling all the relevant variables set forth in New Jersey law against the terms of the December 2000 Agreement. Ex. B (Truitt Decl.), at ¶ 13. The result has been a resounding success for Fortis; year after year TE has produced returns from New Jersey (and elsewhere) that far exceed the hurdle rate set forth in the parties' Agreement, *id.*, and the TE Portfolio probably has been one of Fortis's best investments during difficult economic times. Fortis is well aware that the Portfolio yields returns far in excess of the minimum face value yield, and its decision to file a suit that includes the allegations set forth in Count 3 of the New Jersey Complaint is unfathomable.

## 2. TE's And JFT's Claims In Maryland.

The Complaint in this case consists of three counts. Count 1 requests a declaratory judgment establishing that the parties remain bound by the December 2000 Agreement and awarding plaintiffs ancillary relief, including damages, for Fortis's failure to abide by the terms of the Agreement. Count 2 is a breach of contract action on behalf of TE for Fortis's wrongful termination

of the December 2000 Agreement, which caused approximately $1.8 million in losses.  Count 2 also seeks prompt payment of some $350,000 in currently due invoices for services already rendered under the Agreement.  Count 3 is a breach of contract action filed by JFT as third-party beneficiary to the December 2000 Agreement.  Count 3 alleges that JFT was "a designated third-party beneficiary of the [Agreement] in that the parties expressly intended that [JFT] would perform certain legal services in connection with the redemption and foreclosure of TLCs."  Compl. ¶ 38.  JFT seeks $1.5 million in damages for Fortis's breach.

Fortis's conduct has essentially put TE out of business.  The company has been forced to lay off virtually all its employees and it is in the process of closing its office.  Fortis's wrongful breach of the December 2000 Agreement, and its shameful refusal to pay $350,000 in currently due invoices, has cost a number of Maryland residents their jobs and livelihoods and has shuttered a thriving Maryland business.  The courts of this State have by far the strongest interest in adjudicating this action, and for the reasons set forth below this Court should deny Fortis's manipulative attempt to establish an inconvenient forum for the parties' dispute.

## ARGUMENT

### A. Rule 13 Does Not Apply Because TE Has Moved To Dismiss The New Jersey Complaint.

Fortis chiefly argues that the claims in this case must be dismissed under Federal Rule "12(b)" because they are compulsory counterclaims to the preemptive Complaint Fortis filed in the District of New Jersey.  But Fortis failed to inform the Court of a dispositive fact that defeats its argument:  TE has moved to dismiss the New Jersey action, and therefore Federal Rule 13(a) does not apply at all.

Rule 13(a) states in pertinent part that "[a] *pleading* shall state as a counterclaim any claim which at the time of serving *the pleading* the pleader has against any opposing party." (Emphasis added.)   A motion to dismiss a Complaint is not a "pleading," and the authorities uniformly hold that the compulsory counterclaim rule does not apply to motions to dismiss.  The Court of Appeals' decision in *Mellon Bank, N.A.* v. *Ternisky*, 999 F.2d 791, 795 (4th Cir. 1993), is controlling on this point, but it is not a matter of dispute.  *See also United States* v. *Snider*, 779 F.2d 1151, 1157 (6th Cir. 1985); *Horn & Hardart Co.* v. *National Railroad Passenger Corp.*, 843 F.2d 546, 549 (D.C. Cir.), *cert. denied*, 109 S. Ct. 129 (1988); *National Union Fire Ins. Co.* v. *Jett*, 118 F.R.D. 336, 337-38 (S.D.N.Y. 1988); *Potter* v. *Carvel Stores, Inc.*, 203 F. Supp. 462, 464-65 (D. Md. 1962), *aff'd*, 314 F.2d 45 (4th Cir. 1963); Fed. R. Civ. P. 7 (distinguishing between pleadings and motions and defining the papers that constitute pleadings).  As the Court of Appeals for the Sixth Circuit has explained:

> Until the motion to dismiss is ruled upon it is not known whether the plaintiff has a claim. Without a valid claim there can be no counterclaim, compulsory or permissive. A motion to dismiss pursuant to Rule 12(b), Fed.R.Civ.P., is not a pleading as defined in Rule 7.  There is no reason for a party to file a pleading while a motion to dismiss is pending.

*Snider*, *supra*, 779 F.2d at 1157.

TE's obligation to file compulsory counterclaims in New Jersey has not arisen, and it may never arise.  Indeed, the facts of this case illustrate the wisdom of the drafters' decision to distinguish between pleadings and motions to dismiss in Rule 13(a).  TE, the defendant in the New Jersey action, has moved to dismiss that action for improper venue.  If the District Judge in New Jersey were to grant TE's motion at the same time this Court ruled that TE had to file its action as a compulsory counterclaim in New Jersey, the parties would be caught in a looking-glass world of

13

absurdity. TE would file a counterclaim in New Jersey to a Fortis claim that did not exist, and Fortis would have to find a new venue for its claim, which almost certainly would be Maryland.

TE's motion in New Jersey currently is scheduled for a hearing on April 14, 2003. Although that date is subject to change and the District Judge assigned to the New Jersey action (Hon. Katharine S. Hayden) might not rule on the date of the hearing, TE and JFT reluctantly suggest that this Court hold Fortis's motion in abeyance until Judge Hayden rules on TE's motion in New Jersey. TE's reluctance to suggest this procedure arises from the injustice in rewarding Fortis even minimally for its deceptive conduct, but TE recognizes that one court has to go first, and some courts have concluded that the court first acquiring jurisdiction should decide where related federal suits should continue – not based on the first suit filed but on the balance of convenience and the conduct of the parties. *See*, *e.g.*, *Affinity Memory & Micro, Inc.* v. *K&Q Enters., Inc.*, 20 F. Supp. 2d 948, 955-56 (E.D. Va. 1998). TE has no intention of fighting a two-front war of attrition with a company that advertises $400 billion in assets. To that end, if Judge Hayden retains jurisdiction of the New Jersey action, TE and JFT will file counterclaims in the District of New Jersey at the appropriate time. But TE and JFT emphasize that while they do not want to litigate in two forums, they do want to litigate in the *right* forum, and the only appropriate forum for the parties' dispute is the District of Maryland.

**B. Fortis's Bad-Faith Sandbagging, Combined With The Balance Of Convenience Of The Parties, Warrants An Exception To The Compulsory Counterclaim Rule.**

The rule on compulsory counterclaims is subject to the same equitable exceptions applicable to the "first-filed" rule. *See Nall* v. *Piper*, 1991 W.L. 192141, at *2 (4th Cir. 1991); *Internet Law Library, Inc.* v. *Southridge Capital Mgmt, LLC*, 208 F.R.D. 59, 64 (S.D.N.Y. 2002). Indeed, ultimately the first-filed doctrine supplies the pertinent analysis, and it is not clear why

14

Fortis ignores that doctrine altogether and relies instead solely on Rule 13(a). To state the obvious, if Fortis's analysis of the logical transaction test is correct, then Fortis has the same obligation to file compulsory counterclaims in this action that TE would have in the New Jersey action. The real question is which case should take priority and, therefore, which party must file counterclaims to the other's Complaint.

### 1. The First-Filed Rule Does Not Apply Where The Cases Were Filed At Or About The Same Time.

Under the first-filed rule, "as a principle of sound judicial administration, the first suit should have priority, absent the showing of balance of convenience in favor of the second action." *Ellicott Mach. Corp.* v. *Modern Welding Co.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974) (quotations and citations omitted). In this case, however, the first-filed rule should not apply at all, because the two cases were filed, for all practical purposes, at the same time. Courts often refuse to apply the first-filed rule when the two actions are filed only a few days apart. *See Southern Union Co.* v. *Southwest Gas Corp.*, 165 F. Supp. 2d 1010, 1045 (D. Ariz. 2001) (concluding that when first action was filed on a Friday and the second action was filed on the subsequent Monday, first to file rule would not apply); *Affinity Memory*, *supra*, 20 F. Supp. 2d at 955 ("rigid application of the first-filed rule in this case seems unwarranted where the second action was filed only two weeks after the first action and process in the second action was served long before that in first action was served"); *Ontel Prods.* v. *Project Strategies Corp.*, 899 F. Supp. 1144, 1153 (S.D.N.Y. 1995) (first to file rule is "usually disregarded where the competing suits were filed merely days apart"). Because TE filed its claim on the first day the Circuit Court for Baltimore County was open after Fortis filed its claim in New Jersey (and before TE knew of Fortis's filing), the first-filed rule should not apply at all.

## 2. The Equitable Exceptions To The First-Filed Rule Apply In This Case.

The first-filed rule is subject to a number of well-recognized exceptions, several of which apply foursquare in this case. "Factors that weigh against enforcement of the first-to-file rule include extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping." *Smithers-Oasis Co.* v. *Clifford Sales & Marketing*, 194 F. Supp. 2d 685, 687 (N.D. Ohio 2002) (citations and quotations omitted); *see also Alltrade, Inc.* v. *Uniweld Prods., Inc.*, 946 F.2d 622, 628 (9th Cir. 1991); *EEOC* v. *University of Pa.*, 850 F.2d 969, 972 (3d Cir. 1988), *aff'd on other grounds*, 493 U.S. 182 (1990); *Stone Creek Mechanical, Inc.* v. *Carnes Co., Inc.*, 2002 W.L. 31424390, at *2 (E.D. Pa. Oct. 25, 2002).

As set forth above, Fortis in this case sandbagged TE into refraining from filing an action while Fortis purportedly was considering an amicable resolution. Fortis then secretly filed a preemptive action in New Jersey before, or simultaneously with, its announcement that it was not interested in resolving the dispute after all. Fortis did not bother to notify TE about any of the allegations in the New Jersey Complaint before filing suit, and as a result Fortis ended up filing an "information and belief" pleading that is vexatious and wholly meritless. Fortis's conduct is not only blatant forum-shopping – the Fortis entities are not residents of the District of New Jersey and they have no particular reason to sue there – it is also bad-faith sandbagging that should not be countenanced by the judiciary. To reward Fortis's conduct by forcing TE and JFT to litigate in New Jersey would discourage pre-litigation settlement negotiations among parties and their attorneys.

In *EEOC* v. *University of Pa.*, 850 F.2d at 976, the Court of Appeals for the Third Circuit considered much less egregious conduct and still held that the first-filed rule would not apply. In that case the University of Pennsylvania received an administrative subpoena from the

16

EEOC that had a return date of twenty days. The University then filed an action in federal court in the District of Columbia challenging the EEOC's authority to issue the subpoena. The EEOC responded by filing an enforcement action in the Eastern District of Pennsylvania. Each district court refused to dismiss the action pending before it. On appeal from the Pennsylvania action, the Court of Appeals for the Third Circuit held that the District Court in Pennsylvania properly declined to dismiss, notwithstanding the first-filed rule. The Court held that even in the absence of proof of bad faith by the University, the evidence suggested that the University had engaged in forum-shopping and filed its District of Columbia action to preempt the enforcement proceeding it knew would soon follow. *See id.* at 977.

In this case, Fortis's obvious forum-shopping and preemptive filing is exacerbated by its bad faith in deceiving TE to refrain from filing its own claim. Moreover, Fortis clearly failed to investigate its claims in its race to the courthouse, and as a result it filed a Complaint in New Jersey, which, in TE's judgment, will not meet the standards required under Rule 11. This Court should not reward Fortis's conduct by a rigid adherence to the first-filed rule.

### 3. Fortis's Choice Of A New Jersey Forum Is Entitled To No Weight In This Case.

Although courts often state that a plaintiff's choice of forum is given "significant weight" in the transfer calculus, this "rule" also has many exceptions and most of them also apply in this case. For instance, the plaintiff's choice is entitled to less deference when the plaintiff does not choose its home forum, *see LG Elecs., Inc.* v. *First Int'l Computer, Inc.*, 138 F. Supp. 2d 574, 589 (D.N.J. 2001); *CSR Ltd.* v. *Federal Ins. Co.*, 141 F. Supp. 2d 484, 499 (D.N.J. 2001), or when the conduct underlying the action occurred elsewhere. *Lynch* v. *Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002). In addition, the significance of the plaintiff's choice of forum, although

17

still an important factor, has declined since the enactment of 28 U.S.C. § 1404. *Pennsylvania Mfrs.*
*Ass'n Ins. Co.* v. *Federal Realty Investment Trust*, 2000 WL 964771, at *3 n.2 (D. Md. 2000). In
this case, New Jersey is not the home forum for any of the Fortis entities and, as set forth above, the
operative facts in this dispute arose in Maryland, not New Jersey.

   Courts regularly look through the plaintiff's pleading to determine who is the "natural
plaintiff," and if the nominal plaintiff is in fact a natural defendant and filed suit primarily to choose
a convenient forum, the nominal plaintiff's choice is entitled to no weight. *E.g.*, *Hyatt Int'l Corp.*
v. *Coco*, 302 F.3d 707, 718 (7th Cir. 2002); *First Nationwide Mortgage Corp.* v. *FISI Madison, LLC*,
219 F. Supp. 2d 669, 673 (D. Md. 2002) (declaratory judgment actions disfavored when they are
"filed in anticipation of another lawsuit, in order to obtain a more favorable forum or procedural
posture").

   Moreover, courts generally discount the significance of the plaintiff's choice of forum
when one party defers filing an action pending settlement negotiations, and the other uses the delay
to win the race to the courthouse, *see Ontel Prods.* v. *Project Strategies Corp.*, 899 F. Supp. 1144,
1150 (S.D.N.Y. 1995) ("Where a party is prepared to pursue a lawsuit, but first desires to attempt
settlement discussions, that party should not be deprived of the first-filed rule's benefit simply
because its adversary used the resulting delay in filing to proceed with the mirror image of the
anticipated suit"), or when one party "institute[s] suit in one forum in anticipation of the opposing
party's imminent suit in another, less favorable, forum." *EEOC* v. *University of Pa.*, 850 F.2d at
976 (discussed *supra*).

   Finally, "when the race to the courthouse results in a virtual 'dead heat,' various
circuits have adopted the practice of consulting with one another and deferring to one court among

them to ascertain, after weighing the interest of justice, which tribunal should be the forum for the decision on the merits." *Westinghouse Elec. Corp.* v. *United States*, 598 F.2d 759, 767 (3d Cir. 1979). In this case, the "race," although tainted by Fortis's false start, still resulted in a virtual dead heat, and arguably in a tie after accounting for the storm-related closing in Baltimore County.

In short, there is no reason to defer to Fortis's choice of forum in this case, and indeed, in light of Fortis's conduct, the Court should defer to TE's choice of forum in Maryland.

### 4. The Balance Of Convenience Favors Adjudication In Maryland.

Courts have developed a long list of factors that may be considered in determining which of two available forums should adjudicate a dispute.

> The convenience factors courts consider in applying § 1404(a) include: 1) the plaintiff's choice of forum; 2) relative ease of access to sources of proof; 3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; 4) possibility of a view of the premises, if appropriate; 5) enforceability of a judgment, if one is obtained; 6) relative advantage and obstacles to a fair trial; 7) other practical problems that make a trial easy, expeditious, and inexpensive; 8) administrative difficulties of court congestion; 9) local interest in having localized controversies settled at home; 10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and 11) avoidance of unnecessary problems with conflicts of laws.

*Helsel* v. *Tishman Realty & Constr. Co.*, 198 F. Supp. 2d 710, 711-12 (D. Md. 2002) (internal quotations omitted).

Although not all these factors are relevant in this case, the balance of convenience in these matters clearly tips in favor of an adjudication in Maryland. No party in this case has its home office in New Jersey. The "convenience of the parties" in transfer disputes concerns not just physical convenience, but also their relative financial condition. Defendants are part of a world-

19

wide, multibillion dollar insurance conglomerate, and as far as they are concerned the difference between litigating in Maryland or New Jersey is negligible. TE, by contrast, is a small company with a single office in Maryland. In fact, as a result of Fortis's blatant contractual breaches – including its failure to pay TE some $350,000 in currently due invoices as to which there is no dispute whatever, Ex. B, at ¶ 15 – TE has been forced to lay off eight of its eleven employees and discharge all of its independent contractors. *Id.* Litigating in New Jersey would be a serious impediment for TE (and JFT), and it would be especially unfair to force TE to litigate in a distant forum when Fortis is responsible for limiting TE's resources.

A Maryland forum also would be more convenient for important witnesses. Although Mr. Truitt will be the principal witness for TE, other Truitt employees who have been laid off generally live in Maryland and would not be subject to process in the District of New Jersey. For instance, Tracy Johnson, a Maryland resident and former TE employee, was TE's principal contact with Fortis concerning communications about the flow of TLCs between the two firms. Ex. B (Truitt Decl.), at ¶ 16(d). Rob Fischer, although still a TE employee, is a Maryland resident and has extensive knowledge of the Fortis Portfolio and the financial relations between the parties. *Id.* ¶ 16(e). In addition, an independent consultant named Will Harris developed TE's computer program for purchasing TLCs in New Jersey. *Id.* at ¶ 16(b). Mr. Harris lives in Churchville, Maryland, and would be subject to process in Maryland. *Id.* He could provide critical testimony establishing that TE complied with the contractual requirements to purchase TLCs with certain minimum yields. Finally, Michael Stesch, a computer consultant based in Westminster, Maryland, revised TE's computer system in an effort to attract buyers for the Fortis Portfolio; his testimony could help

establish that TE was working diligently to sell the Portfolio, in accordance with Fortis's wishes. *See id.* ¶ 16(c).

The most important third-party witness for Fortis's case against TE will be Daniel Kusic, the president of TaxServ; indeed, Mr. Kusic's testimony is indispensable to the first two counts of Fortis's New Jersey Complaint.  *See* Ex. B, at ¶ 16(a).  Mr. Kusic's firm is based in McLean, Virginia, and as such he or other TaxServ employees would be subject to compulsory process in this Court, which is 48 miles from TaxServ's offices in McLean (according to a MapQuest search), but not in Newark, New Jersey, which is 227 miles from TaxServ's offices.  *See* Ex. B (Truitt Decl.), at ¶ 17;  Fed. R. Civ. P. 45(b)(2) (permitting service of subpoenas within 100 miles of place of trial).

Virtually all of the relevant records are maintained in TE's offices in Maryland.  Ex. B, at ¶ 18.  Other records are presumably maintained by Fortis in Florida or New York, but TE is not aware that Fortis maintain any relevant records in New Jersey.

Significantly, this Court is the proper forum for the entirety of the parties' dispute because venue is appropriate as to all claims only in the District of Maryland.  Under 28 U.S.C. § 1404(a), a Court may transfer an action to "any other district or division where it might have been brought," and TE has requested that the New Jersey action be transferred to this Court as an alternative to its motion to dismiss the New Jersey action for improper venue.  It is clear that Fortis's New Jersey action "might have been brought" in the District of Maryland, because the sole defendant "resides" in this district.  *See* 28 U.S.C. § 1391(a)(1).  On the other hand, the claims in this case could *not* have been brought in New Jersey because none of the venue provisions in § 1391(a) applies.  No defendant in the Maryland action resides in New Jersey, *see* § 1391(a)(1), and

21

"a substantial part of the events or omissions giving rise to [TE's] claim" in Maryland did not arise in the District of New Jersey. *See* § 1391(a)(2). (Section (a)(3) does not apply because there is a district – Maryland – in which the action may have been brought pursuant to § (a)(2).) As TE's Complaint makes clear, Fortis breached the December 2000 Agreement by failing to provide funds to TE in Maryland in accordance with the parties' contract. No reading of TE's Complaint could suggest that New Jersey is a proper venue for that claim, and indeed the only logical (federal) venue for TE's Complaint is the District of Maryland.[2]

In addition, the parties expressly provided in the December 2000 Agreement that their contract would be governed by Maryland law, and that provision applies to the Commission Agreement as well. Choice-of-law provisions are given increased significance in transfer motions when the pertinent law is unsettled. Count 1 of Fortis's Complaint in New Jersey seeks damages for a purported breach of fiduciary duty. Maryland law on fiduciary duty has been unsettled since the Court of Appeals' decision in *Kann* v. *Kann*, 344 Md. 689, 690 A.2d 509 (1997), which held that Maryland does not recognize a "universal or omnibus" claim for breach of fiduciary duty. In general, the *Kann* decision has required lower courts to re-evaluate fiduciary claims in all contexts and determine anew whether they state a claim. Decisions issued after *Kann* are not entirely consistent, *see Froelich* v. *Erickson*, 96 F. Supp. 2d 507, 526 n.22 (D. Md. 2000), *aff'd*, 2001 W.L. 256080 (4th Cir. 2001), although they tend to reject fiduciary claims when other remedies are

---

[2] Moreover, it is quite clear that venue is improper in New Jersey at least as to Counts 1 and 2 of Fortis's Complaint in the New Jersey action. *See* Ex. A, at 12-15. Even if venue were proper in New Jersey as to Count 3, federal courts often transfer cases to a district in which venue is proper as to all counts rather than dismiss part of the action. *E.g.*, *Benton* v. *England*, 222 F. Supp. 2d 728 (D. Md. 2002); *Schultz* v. *Ary*, 175 F. Supp. 2d 959 (W.D. Mich. 1991); *Lengacher* v. *Reno*, 75 F. Supp. 2d 515 (E.D. Va. 1999).

available and particularly when the parties are sophisticated business persons whose relationship

arises from a contract.  *E.g.*, *Swedish Civil Aviation Admin.* v. *Project Mgmt. Enters., Inc.*, 190 F.

Supp. 2d 785, 801 (D. Md. 2002); *Kerby* v. *Mortgage Funding Corp.*, 992 F. Supp. 787, 803 (D. Md.

1998).  For that reason, and because Fortis's New Jersey Complaint does not comply with the

requirements of *Kann*, TE has moved to dismiss Count 1 of the New Jersey Complaint (although TE

has contended that the motion should be decided by this Court after transfer, if the case is not

dismissed for improper venue).  Thus, one additional reason for transfer is the general uncertainty

in the Maryland law that governs the first count of Fortis's Complaint.

A Maryland court also has a much stronger interest in developing Maryland law on

fiduciary duty, as well as in adjudicating a dispute that will have a profound effect on citizens in this

district.  This Court has a demonstrable familiarity with Maryland's post-*Kann* law on fiduciary

duty.  *See Kerby* v. *Mortgage Funding Corp.*, 992 F. Supp. 787, 803 (D. Md. 1998).  In addition,

Fortis's conduct has resulted in millions of dollars in losses to two Maryland entities and the loss

of a dozen or so jobs for Maryland citizens.  Maryland's interest in adjudicating this dispute is far

greater than New Jersey's, which has no apparent connection to any of the parties in this case.

Finally, statistics maintained by the Administrative Office of the U.S. Courts suggest

that the parties are likely to receive a trial faster in the this district than they would in New Jersey,

which receives approximately 30 percent more case filings than the District of Maryland.  For the

12-month period ending September 30, 2002, the median time from case filing to trial in civil

matters was 22.5 months in Maryland, vs. 30.0 months in New Jersey.  Statistics from the previous

five years show comparable advantages in Maryland.  (The median time from filing to disposition,

on the other hand, is roughly the same in each district for civil cases.  These and other statistics are available at www.uscourts.gov/cgi-bin/cmsd2002.pl.)

   For all these reasons, Fortis's reliance on the compulsory counterclaim rule as a basis for its motion to dismiss is unfounded, and TE and JFT request that the motion be denied.

## C. The Court Should Not Dismiss Fortis, Inc. As A Party Defendant.

### 1. Fortis, Inc. Adopted The Contract And Is Bound By Its Terms.

   Defendants move to dismiss the claims against Fortis, Inc. only, on the ground that Fortis[3] is not a signatory to the Agreement.  At this juncture, however, the Court must accept all allegations in the Complaint as true, and those allegations are more than sufficient to state a claim that Fortis adopted the Agreement and is bound by its terms.

   According to the Complaint, Fortis "is a holding company for many corporations located in the United States that are engaged in the financial services industry, including insurance." Compl. ¶ 3.  Fortis acquired defendants American Bankers Insurance Group ("ABIG") and American Security Insurance Company in late 1999, and formed an entity called the Assurant Group from those and other entities.  Compl. ¶¶ 4-5.  Although Fortis was not an express signatory to the December 2000 Agreement, "[a]t some point during the year 2001, Fortis began to exercise direct responsibility for monitoring the TLC investment portfolio managed and serviced by TE on behalf of Fortis's subsidiaries in the Assurant Group."  Compl. ¶ 18.  In June 2002, Fortis notified TE that Assurant Group was "planning to move the Tax Certificate responsibility to Fortis NY by the end of this month."  Ex. D, at ¶ 3.  Beginning in July 2002, JFT sent all its invoices for legal services and expenses incurred in connection with the Portfolio to Fortis directly.  *Id.*  Since that time, TE and

---

[3] For purposes of this section, "Fortis" refers solely to defendant Fortis, Inc.

JFT have transacted business principally with Fortis personnel, rather than ABIG or Assurant Group personnel. *Id.*

In November 2001, "Fortis unilaterally announced that it would not authorize TE to purchase any new TLCs," Compl. ¶ 18, which prompted "a series of meetings and negotiations between Fortis and TE, designed to compensate TE for the requested early termination of the contract." *Id.* ¶ 19. The Complaint also describes the series of meetings between Fortis and TE, including a notice of breach TE issued to Fortis and the Assurant Group, and the parties' resolution of their dispute through a Commission Agreement dated March 6, 2002. The Commission Agreement, which is attached to the Complaint as Exhibit B, was sent by Mr. Truitt to James Brinkerhoff of "Fortis Advisors, Inc.," and signed by Mr. Brinkerhoff for "Fortis Assurant Group/American Bankers." Compl. Ex. B, at 2. The Commission Agreement expressly states – in a clause added by defendants – that the "provisions of this letter will govern any inconsistent provisions contained in the Contract between Truitt and American Bankers [*i.e.*, the December 2000 Agreement]. This letter shall otherwise be deemed a part of and is subject to the terms of the Contract." *Id.* In early 2003, when defendants again claimed that they had no obligation to fund the purchase of TLCs, "Fortis, on behalf of ABIG and the Assurant Group . . . gave formal notice to TE purporting to terminate" the December 2000 Agreement. Compl. ¶ 26.

These allegations clearly suggest that Fortis adopted or "accepted" the contract. Under settled Maryland law, a nonsignatory "may later accept or adopt a contract and thus be bound by it." *Porter* v. *General Boiler Casing Co.*, 284 Md. 402, 409, 396 A.2d 1090, 1094 (1979). "Acceptance can be accomplished by acts as well as words; no formal acceptance is required." *Id.* Nor is notification of acceptance essential to the formation of a contract. *Id.* at 410, 396 A.2d at

1094.  In *Porter*, the Court of Appeals pointedly observed that a party who signs one contract that modifies an earlier contract may have accepted the earlier contract and be bound by its terms.  *Id.* at 410, 396 A.2d at 1094 (interpreting rule created by *Snider Bros., Inc.* v. *Heft*, 271 Md. 409, 414, 317 A.2d 848, 851-52 (1974)).

Under the facts alleged, Fortis – the owner of the signatory entities – assumed active management of the December 2000 Agreement from its subsidiaries, announced that its subsidiaries would no longer abide by the terms of the Agreement, negotiated directly with TE to modify the Agreement, entered into a written Commission Agreement with TE that expressly incorporated the December 2000 Agreement, and acknowledged that the Commission Agreement was "subject to the terms" of the December 2000 Agreement.  Under these facts, Maryland law would clearly allow the finder of fact to conclude that Fortis had adopted the December 2000 Agreement and is fully bound by its terms.  For that reason, the Court should deny the motion to dismiss Fortis, Inc.

### 2.  Alternatively, Fortis May Have Acquired The Liabilities Of Its Subsidiary Entities.

In any event, the Court should not dismiss Fortis at this juncture because it is not clear whether Fortis has assumed the liabilities of one or more of the four subsidiary entities that executed the December 2000 Agreement.  As alleged in the Complaint, Fortis has exercised increasing measures of control over the management of the Portfolio, and it has apparently restructured and to some degree merged the various entities that executed the Agreement.  It is not clear at this juncture whether all those entities have maintained a separate corporate existence, or retained sufficient assets to cover their liabilities.  If Fortis has acquired the assets or liabilities of any of these entities, either voluntarily or by operation of law, then Fortis could be directly liable on the December 2000 Agreement.  The Court should not dismiss Fortis before plaintiffs have an

opportunity to discover the facts underlying the relationship between Fortis and the Assurant Group entities.

For these additional reasons, the Court should deny Fortis's motion to dismiss.

**D. JFT Is A Proper Plaintiff Because It Is A Third-Party Beneficiary To The December 2000 Agreement.**

Count 3 of the Complaint quite literally states a claim that JFT is a third-party beneficiary under the December 2000 Agreement. Paragraph 38 of the Complaint states that "Truitt is a designated third-party beneficiary of the [Agreement] in that the parties expressly intended that Truitt would perform certain legal services in connection with the redemption and foreclosure of TLCs purchased in Maryland by TE on behalf of the Assurant Group, and that Truitt would be paid for these legal services." *See also* Compl. ¶ 14. The legal fees payable to JFT were always a critical component to the contractual relationship between TE and Assurant Group. Ex. D, at ¶ 4. Roughly half of the net income paid to TE/JFT over the years was paid for legal services rendered, and Mr. Truitt would not have been willing to enter into the December 2000 Agreement with the Assurant Group entities if JFT had not been authorized to provide legal services. *Id.*

Fortis moves to dismiss Count 3 of the Complaint, however, ostensibly because the references to JFT in the December 2000 Agreement itself are insufficient to establish that the parties intended to recognized JFT as a beneficiary. Fortis's argument is premised initially on a misreading of the plain language of the Agreement. The December 2000 Agreement lists the services TE would provide to Fortis. Those services include all negotiations with municipal governments, due diligence tasks, lien and title searches, required filings and registrations, collection procedures, and negotiations with property owners and banks. Compl. Ex. A, at ¶ 3. In addition, TE's services included "Retention of counsel and oversight and review of all legal actions. [Assurant Group]

27

*understands and acknowledges that James F. Truitt, Jr., President of [TE], may be retained as counsel to represent [Assurant Group] in connection with the redemption of a TLC or the foreclosure of an underlying property.*" Compl. Ex. A, at ¶3(b)(vi) (emphasis added). It is difficult to imagine how the parties could have more explicitly set forth their intent to make Mr. Truitt's law firm a beneficiary of the Agreement. TE, not Fortis, had authority to retain counsel to provide legal services in connection with the Portfolio. Fortis acknowledged in the contract itself that TE could retain Truitt to provide those legal services. There is no legitimate question, therefore, that Fortis explicitly acknowledged and agreed that Truitt would be a third-party beneficiary under the parties' Agreement.

Moreover, as set forth in the attached Second Declaration of James F. Truitt Jr., JFT has represented Fortis and its predecessors on Portfolio matters in Maryland *since 1994*. Ex. D., at ¶ 2. Throughout that time Fortis has known of and authorized JFT's representation. Invoices are sent from JFT to Assurant Group, and payments are made to JFT. *Id.* The legal fees payable to JFT were always a critical component to the contractual relationship between TE and Assurant Group, *id.* at ¶ 5, and Mr. Truitt believes that Assurant Group personnel have been aware of that fact since 1994. *Id.* TE certainly intended that JFT would be a beneficiary of the December 2000 Agreement. *Id.* at ¶ 6. Mr. Truitt also believes that Assurant Group also intended JFT to be a beneficiary of that Agreement. Assurant Group personnel certainly knew that TE intended to retain JFT to provide legal services in Maryland in connection with the Portfolio, and they authorized that practice in writing. *Id.*

Maryland law on contractual third-party beneficiaries is not nearly as narrow as Fortis suggests, and it certainly does not support dismissal of Count 3 at the outset of this case. "In general

terms, a third party beneficiary contract arises when two parties enter into an agreement with the intent to confer a direct benefit on a third party, allowing the third party to sue on the contract despite the lack of privity." *Flaherty* v. *Weinberg*, 303 Md. 116, 125, 492 A.2d 618, 622 (1985); *Shofer* v. *Stuart Hack Co.*, 124 Md. App. 516, 529, 723 A.2d 481, 487, *cert. denied*, 354 Md. 331, 731 A.2d 440 (1999). "In determining whether a party is a third party beneficiary to a contract, the controlling issue is whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form." *College of Notre Dame, Inc.* v. *Morabito Consultants, Inc.*, 132 Md. App. 158, 179, 752 A.2d 265, 276 (2000). It is not required that the third-party beneficiary be expressly named in the contract. *See, e.g.*, *Geo. Byers Sons, Inc.* v. *East Europe Import Export, Inc.*, 488 F. Supp. 574, 584 (D. Md. 1980).[4]

Fortis claims that the Agreement is ambiguous because it states that TE "may" retain JFT rather than that it "would" retain JFT. This is nonsense. Fortis knew to a moral certainty that TE, whose president is Mr. Truitt, would retain JFT, whose principal is also Mr. Truitt, to provide legal services where JFT was authorized to provide them. By December 2000, that had been the parties' practice for more than six years, and Fortis was well aware that a large measure of the value in servicing the Portfolio derived from the legal services provided to Fortis. Moreover, even if the Agreement were ambiguous, the consequence would be not to dismiss the claims, but to present

---

[4] One decision from the Court of Special Appeals states that "a third party qualifies as a third party beneficiary of a contract only if the contracting parties intend to confer standing to enforce the contract upon that party." *Volcjak* v. *Washington County Hosp. Ass'n*, 124 Md. App. 481, 509, 723 A.2d 463, 477, *cert. denied*, 354 Md. 115, 729 A.2d 406 (1999). That statement is not supported by the Court of Appeals cases it cites, or by any other Maryland law as far as TE knows. The primary parties must intend to confer a benefit on a third party, and if they do, their intent "allow[s]" the third party to enforce the contract. There is no separate requirement of a specific intent to confer standing to enforce the contract upon the third party.

extrinsic evidence to the trier of fact in an attempt to determine the intent of the parties. *E.g.*, *Chicago Title Ins. Co.* v. *Lumbermen's Mutual Casualty Co.*, 120 Md. App. 538, 549, 707 A.2d 913, 918 (1998). Mr. Truitt's Second Declaration, attached hereto as Exhibit D, clearly supports plaintiffs' interpretation of the December 2000 Agreement.

Fortis also contends that the "'real promisees' were the parties to the [December 2000 Agreement]," and "no reasonable person could find that 'a direct purpose of the transaction or relationship' was to provide Mr. Truitt (or his law firm) with legal work." Fortis Mem. at 11. In fact, the evidence will establish overwhelmingly that reasonable people would conclude exactly that, and Mr. Truitt's Second Declaration more than suffices to present a triable question of fact on this issue.

Fortis ultimately resorts to a hypertechnical attempt to distinguish between "James F. Truitt Jr.," the attorney designated as the third-party beneficiary in the Agreement, and "James F. Truitt Jr., P.A.," the plaintiff in Count 3 and the formal name under which James F. Truitt Jr. practices law. The Court should not waste time on this sophistry. Plaintiffs would be happy to add Mr. Truitt in his individual capacity if that is what Fortis is seeking, but there is no legal need to do so. When the parties identified "James F. Truitt Jr." as an attorney who would perform legal services, they meant that he would perform those services through his law firm. Fortis received scores of invoices, documents, checks, and other papers on the letterhead of James F. Truitt Jr., P.A., and it has always known that Mr. Truitt practices law in Maryland through his solely owned professional association.

For all these reasons, the Court should deny defendants' motion to dismiss Count 3 of the Complaint.

**CONCLUSION**

For the reasons stated, plaintiffs Truitt Enterprises, LLC and James F. Truitt Jr., P.A. respectfully request that the Court deny the motion to dismiss in its entirety.

Respectfully submitted,

MURPHY & SHAFFER

By: ___/s/ *William J. Murphy*___
    William J. Murphy (#00497)
    John J. Connolly (#09537)

36 S. Charles St., Suite 1400
Baltimore, Maryland 21201
(410) 783-7000
(410) 783-8823 (fax)

*Attorneys for Plaintiffs*