Truitt Enterprises, LLC<br>
1526 York Road<br>
Lutherville, Maryland 21093<br>
410-583-9640<br>
Telecopier: 410-583-9644

December 14, 2000

Mr. Len Garcia  
Senior Vice President and  
Chief Investment Officer  
Assurant Group  
11122 Quail Roost Drive  
Miami, Florida 33157-6596

Dear Len:

    The purpose of this Letter Agreement is to set forth the terms of the contract between American Bankers Insurance Group, Inc. on behalf of itself and its subsidiaries, American Security Insurance Company, Standard Guaranty Insurance Company and Union Security Life Insurance Company (hereinafter referred to individually and collectively as Assurant Group ("A.G."). and Truitt Enterprises, LLC ("T"), relating to the investment by "A.G." in tax lien certificates. This letter agreement is to be effective January 1, 2001.

    1.    <u>Retention as Adviser</u>. "A.G" hereby retains "T" as "A.G.'s" adviser, and "T" hereby agrees to serve as "A.G.'s" adviser, in connection with the investment by "A.G." in tax lien certificates ("TLCs"), pursuant to the terms hereof. "A.G." understands and acknowledges that "T" has made no guarantees or assurances as to the performance of "A.G.'s" investments hereunder. "A.G." further acknowledges that it understands the risks attendant to investing in TLCs.

    2.    <u>Authorization; Investment Guidelines.</u> "T" is hereby authorized, on behalf of "A.G.", without obtaining the consent of or consulting with "A.G." or any other person, to purchase a portfolio of up to at least $35 million of TLCs (the "Portfolio"), to service such Portfolio, and to take all actions necessary and appropriate to redeem or otherwise liquidate such TLCs, subject to the following limitations and guidelines:

    a)    The issuer of all such TLCs shall be a municipality located in New Jersey, Maryland, the District of Columbia, Arizona, Illinois or Indiana, or such other state approved in advance by "A.G".



    b)    The principal amount of each TLC redeemed or liquidated on or before December 31, 2003 shall be reinvested by "T", on behalf of "A.G.", in TLCs. Interest on TLCs redeemed or liquidated on or before December 31, 2003 shall be retained by "A.G.". The principal amount and interest on TLCs redeemed or liquidated after December 31, 2003 shall be retained by "A.G." Notwithstanding the foregoing to the contrary, "T", in its sole discretion, may decide not to reinvest the principal amount of any TLC redeemed or liquidated on or before December 31, 2003 if market conditions would render such reinvestment imprudent for "A.G." and/or "T".

Mr. Len Garcia
December 14, 2000
Page two

---

    c)    The aggregate amount of TLCs in the Portfolio at any time with a principal amount between $100,000 and $300,000 shall not exceed $2 million.

    d)    No TLC purchased hereunder shall exceed $300,000 in principal amount.

    e)    No TLC purchased hereunder shall have a lien to property value ratio in excess of 20%.

    f)    The minimum face value yield (including subsequent taxes and penalties) of any TLC purchased hereunder shall not be less than the "hurdle rate" (as defined below) plus 425 basis points.

    g)    TLCs may be purchased on residential, commercial and unimproved properties; provided, however, that "T" shall not purchase any TLCs on commercial properties which "T" has actual notice, through the exercise of reasonable due diligence, of any potential environmental problems. Examples of commercial properties with potential environmental problems are vacant gas stations and industrial sites with chemical storage facilities.

    h)    "T" shall not take title to any property underlying a TLC, on behalf of "A.G.", if the cost to take title exceeds 60% of the then current appraised value of such property. In any such case in which "T" is prohibited from taking title to a property on behalf of "A.G.", and "T" in its discretion has determined that the TLC in question is uncollectible, "T", at its option, may purchase the TLC in question from "A.G.". The purchase price shall be equal to the principal amount of such TLC, plus accrued interest to the date title is taken thereon, plus all direct costs expended by "A.G." in connection with such TLC. The accrued interest portion of such purchase price shall not be paid by "T" until "T" has completed the liquidation of the underlying property. If "T" does not exercise such option, the principal amount of the TLC in question shall be charged against the applicable reserve established under Paragraph 6 (b) (i) below.

    i)    "T" shall not permit any bidder employed or otherwise engaged by "T" to engage in any activities that could lead to a charge of collusion. For the purposes of this agreement, "collusion" shall mean reaching or seeking to reach agreements or understandings with other tax lien purchasers relating to rates to bid or who will win the bid at auctions. "T" represents and warrants that neither "T" nor its agents or employees shall (i) enter into discussions with other bidders about their bids or strategy; (ii) agree with other bidders on the specific interest rates to be bid, (iii) agree with other bidders on a floor interest rate below which they will not bid, (iv) agree with other bidders as to which liens they will make bids on and which they will not bid on and (v) engage in any activities that could lead to a charge of collusion. "T" represents and warrants that during the term of this agreement, "T" shall maintain the policy that any bidder employed or

Len Garcia
July 17, 2000
Page three

---

otherwise engaged by "T" who violates its "anti-collusion" policy shall be immediately dismissed.

"A.G." shall execute all customary documents necessary to enable "T" to perform its responsibilities hereunder, including, without limitation, any documents evidencing "T"'s authority to act on behalf of and bind "A.G."

3.  <u>Services to be Provided by "T"</u>. During the term hereof, "T" shall provide the following services relating to all TLCs held in the Portfolio:

   a)   Acquisition of TLCs.

      i.    All negotiations with municipal governments.
      ii.   Attendance at public auction sales.
      iii.  Electronic criteria establishment through TRW and local databases.
      iv.   On site inspection and market analysis.
      v.    Lien searches on TLCs with a principal amount over $50,000.
      vi.   Title searches on TLCs with a principal amount over $100,000.

   b)   Servicing of TLCs.

      i.    Data-base management of the Portfolio.
      ii.   Required filings and registrations.
      iii.  Release/assignment preparation.
      iv.   Collection procedures, as required in "T"'s discretion, to include mail notice, telephone contact, notice posting, etc.
      v.    Negotiations with property owners, banks and other lien holders/creditors.
      vi.   Retention of counsel and oversight and review of all legal actions. "A.G." understands and acknowledges that James F. Truitt, Jr., President of "T", may be retained as counsel to represent "A.G." in connection with the redemption of a TLC or the foreclosure of an underlying property.

   c)   Reporting to "A.G."
      i.    Monthly reconciliations of the Portfolio.
      ii.   Quarterly profit/loss statements on a cash and accrual basis.

4.  <u>Responsibilities of "A.G."</u>. During the term hereof, "A.G." shall be responsible for the following:

Mr. Len Garcia
December 14, 2000
Page four

    a)    Storage of original TLCs.
    b)    Endorsement of TLCs, releases and assignments, as required.
    c)    Bank account reconciliations.
    d)    Accounting and tax matters relating to the Portfolio (except as enumerated in Section 3 above).

5.    <u>Expense Allowances; Costs.</u> (a) "A.G." shall pay to "T", monthly in arrears, (i) 1.5% of the amount of all TLCs purchased during each month, to cover acquisition expenses; and (ii) .0625% of the aggregate principal amount of the TLCs in the Portfolio on the last day of each month, to cover servicing costs. Such expense allowances are payable within thirty days of the end of each month. In the event of termination, such allowances shall be paid upon termination and, in the case of servicing costs under subparagraph (ii) above, shall be pro rated if the termination date is not the last day of a month.

(b)    "A.G." shall be responsible to pay all costs associated with the responsibilities enumerated in paragraph 4 above. Such costs shall be deemed to be .03% per month of the aggregate principal amount of the TLCs in the Portfolio on the last day of each month, pro rated in the event of termination on a date which is not the last day of a month.

(c)    "A.G." shall pay directly 100% of all expenses which attach to a TLC, including, without limitation, fees and expenses of attorneys, title companies, process servers and auctioneers, and court costs. In the event that "T" advances any such expenses on behalf of "A.G.", "A.G." shall immediately reimburse "T" therefor upon presentation to "A.G." of an invoice.

6.    <u>Profit Sharing.</u> (a) The "hurdle rate" for each TLC means the yield on a two-year sequential collateral mortgage obligation ("CMO"), at the time the TLC is purchased, times a fraction, the denominator of which is 365 and the numerator of which is the number of days from and including the date the TLC is purchased through the date the TLC is redeemed or liquidated. The yield on a two-year CMO shall be as published in <u>The Wall Street Journal.</u> If such yield is published as a spread over the yield on U.S. Treasury securities, the yield on such securities also shall be as published in <u>The Wall Street Journal.</u>

The term "profit" as to each TLC means the amount received upon redemption or liquidation of such TLC, minus the purchase price of such TLC, and minus the expense allowances and costs enumerated in paragraph 5 above relating to such TLC.

The term "TLC Traunch" or "Traunch" means all TLCs purchased at the same time and at the same auction or private sale.

Mr. Len Garcia
December 14, 2000
Page five

---

    (b)    The profit on each TLC shall be allocated and paid as follows:

        i.    First, to be held in reserve by "A.G.", an amount equal to an annualized return on the principal amount of such TLC equal to 1.0%.

        ii.    Next, to "A.G.", the amount, if any, by which the aggregate amount charged against the reserve to which such TLC belongs exceeds such reserve.

        iii.    Next, to "A.G.", an amount equal to an annualized return on the principal amount of such TLC equal to the hurdle rate plus 1.25%.

        iv.    Next, to "T", an amount equal to an annualized return on the principal amount of such TLC equal to 1.25%; and

        v.    The balance to be shared equally by "A.G." and "T".

Within thirty days of the last day of each month during the term hereof, "A.G." shall pay to "T" its share of the profits on all TLCs redeemed or liquidated during such quarter. Upon termination hereof, "A.G." shall pay to "T" its share of profits on all TLCs redeemed or liquidated during the period from the end of the immediately preceding calendar quarter through the date of termination.

    (c)    Each TLC Traunch shall have a separate reserve established under paragraph 6 (b) above. Each such reserve shall be distributed at such time as all TLCs in the Traunch have been redeemed, liquidated or deemed by "T" to be uncollectible (such time referred to as the "Distribution Date"), as follows:

        i.    First, to "A.G.", to the extent that the profits on any TLC in such TLC Traunch realized by "A.G." are less than the amounts enumerated in paragraph 6 (b) (iii) above;

        ii.    Next, to "T", to the extent that the profits on any TLC in such TLC Traunch realized by "T" are less than the amount enumerated in paragraph 6 (b) (iv) above; and

        iii.    The balance to be shared equally by "A.G." and "T".

Mr. Len Garcia
December 14, 2000
Page six

---

Within thirty days of the Distribution Date for each reserve, "A.G." shall pay to "T" its share of such reserve. Upon termination hereof, "A.G." shall pay to "T" its share of all previously undistributed reserves.

(d) "A.G." shall not be responsible to pay any fees to anyone other than "T".

7. (a) Term. This agreement shall terminate thirty days after all of the TLCs purchased hereunder are redeemed, liquidated or, in "T"'s sole discretion, have become uncollectible. In the event that "A.G." fails to reinvest the principal amount of any TLC redeemed or liquidated on or before December 31, 2003 in accordance with the terms of paragraph 2 (b) above, "A.G." shall pay to "T" an amount equal to 1% of such principal amount.

(b) "A.G." may terminate this agreement in the event that "T" has breached any material term of this agreement, including but not limited to, Section 2.

8. Miscellaneous. This agreement represents the entire agreement between "A.G." and "T" relating to the subject matter hereof. This agreement may be amended only in writing signed by "A.G." and "T". This agreement shall be governed by the laws of the State of Maryland. This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Please indicate your agreement to the terms hereof by signing below.

Sincerely,

Agreed to:

TRUITT ENTERPRISES, LLC

By: _____
James F. Truitt, Jr.
President

AMERICAN BANKERS INSURANCE GROUP, INC. & SUBSIDIARIES

By: _____
Arthur Heggen
Corporate Secretary

AMERICAN SECURITY INSURANCE COMPANY

By: _____
Arthur Heggen
Assistant Secretary

Mr. Len Garcia
December 14, 2000
Page seven

---

STANDARD GUARANTY INSURANCE
COMPANY

By: _____
Arthur Heggen
Assistant Secretary

UNION SECURITY LIFE INSURANCE
COMPANY

By: _____
Arthur Heggen
Assistant Secretary