IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
– Northern Division –

| | | |
|---|---|---|
| TRUITT ENTERPRISES, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. CCB 03-527 |
| | ) | (Consolidated) |
| FORTIS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | | |
| AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. CCB 03-1422 |
| | ) | (Consolidated) |
| TRUITT ENTERPRISES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S MOTION TO COMPEL ANSWERS TO
INTERROGATORIES AND REQUEST FOR EXPENSES**

Plaintiffs Truitt Enterprises, LLC and James F. Truitt Jr., P.A. (collectively, "TE"), by their undersigned attorneys, hereby move for an order compelling defendants Fortis, Inc., American Bankers Insurance Group, Inc. ("ABIG"), and American Security Insurance Company ("ASIC") (collectively, "Fortis"), to submit proper responses to plaintiffs' Interrogatories. TE also requests that the Court award expenses against Fortis for its complete failure to comply with its discovery obligations under the Federal Rules of Civil Procedure.

## MATERIAL FACTS

TE manages investments in tax liens for institutional investors like Fortis. Amended Complaint ("Compl."), at ¶ 15. Tax-lien managers research municipal property-tax rolls and purchase delinquent tax bills on suitable properties, in return for tax lien certificates, or "TLCs," from the municipal taxing authorities. After buying a TLC from a municipality, TE attempts to collect penalties and interest prescribed by statute in various jurisdictions from an interested party, such as a mortgagee or property owner, much as a municipality would do if it had the time, resources, and expertise. Alternatively, TE forecloses on the encumbered property and recoups its investment from subsequent sale proceeds. After paying expenses for lawyers, title-searchers, and the like, TE returns to the institutional investor the majority of the proceeds from the TLC, and TE retains agreed-upon amounts in fees and profit.

Since approximately 1994, TE's principal client has been American Bankers Insurance Group ("ABIG") and related entities that were acquired by defendant Fortis in late 1999. The parties operated under a written contract, the most recent version of which was dated December 14, 2000. Under this "December 2000 Agreement," Fortis (or its subsidiaries) retained TE as its "adviser, in connection with the investment by [Fortis] in [TLCs], pursuant to the terms hereof." Compl. Ex. A (filed Sep. 9, 2003), at 1. The Agreement explicitly provided that TE "is hereby authorized, on behalf of [Fortis], without obtaining the consent of or consulting with [Fortis] or any other person, to purchase a portfolio of up to at least $35 million of TLCs (the 'Portfolio'), to service such Portfolio, and to take all actions necessary and appropriate to redeem or otherwise liquidate such TLCs," subject to stated limitations and guidelines. Compl. Ex. A, at 1. Mr. Truitt, through his law firm JFT, represented Fortis in Maryland TLC proceedings. *Id.* at ¶¶ 2, 3(b)(vi); *see* Compl.

¶ 20.  TE and JFT performed their obligations under the December 2000 Agreement (and predecessor agreements), and year after year the Portfolio generated above-market returns for Fortis.

Nevertheless, in late November 2001, shortly after Fortis began actively managing this investment, Fortis employees claimed that they were free to withhold funds from TE for the purchase of new tax liens (subject only to a contractual penalty).  Compl. ¶ 24.  On January 11, 2002, TE sent Fortis a formal notice that ABIG and Fortis were in breach of the December 2000 Agreement.  *Id.* at ¶ 26.  On January 23, 2002, after discussions between the parties, Fortis's representatives agreed to continue in effect the existing terms of the December 2000 Agreement.  *Id.* at ¶ 27.  In March 2002, the parties entered into a separate Commission Agreement that gave TE an incentive to sell the entire Portfolio.  Compl. ¶ 27 & Ex. B.

By the end of 2002, however, Fortis again began raising questions about TE's ability to purchase new tax liens up to the $35 million level that was authorized by the parties' contract. In early February 2003, Fortis refused to fund a specific investment of $1.5 million for new TLCs from Maricopa County, Arizona, even though the principal amount of the Portfolio balance was approximately $28 million at the time – well within the $35 million cap.  Compl. ¶ 30.  On February 10, 2003, TE's counsel sent another Notice of Breach Letter to Fortis.  *Id.* ¶ 31.  That letter asked Fortis to reconsider its position forthwith, to abide by the contractual commitments in the December 2000 Agreement, and to provide TE with written assurances by February 14, 2003, that it would continue to fund the purchase of new tax lien certificates by TE at two upcoming sales.  *See id.*  In response, Fortis sent a letter to TE dated February 18, 2003, purporting to terminate the December 2000 Agreement for an unspecified material breach.  Fortis invoked ¶ 7(b) of the December 2000 Agreement, which states that Fortis "may terminate this agreement in the event that [TE] has

3

breached any material term of this agreement, including but not limited to, Section 2." Compl. Ex. A, at ¶ 7(b). Without informing TE, Fortis also filed suit against TE in the United States District Court for the District of New Jersey, evidently on the same day Fortis sent its termination letter.

Given the tenor of the notice of termination sent by Fortis on February 18, 2003, TE prepared a Complaint to be filed in the Circuit Court for Baltimore County, Maryland, seeking declaratory relief with respect to the parties' rights and obligations under the December 2000 Agreement, and seeking damages in the event that Fortis carried through with its threat to terminate the contract, which it has since done. TE's Complaint was filed on February 20, 2003. TE learned on February 21, 2003, that Fortis had filed its claim in New Jersey a few days earlier. After extensive preliminary proceedings, the United States District Court for the District of New Jersey transferred Fortis's action to this Court, where Fortis's claims were consolidated with TE's Complaint, and the substance of Fortis's Complaint, as subsequently amended, now serves as its Counterclaim in this action.

Fortis's initial Complaint and existing Counterclaim contain two basic allegations: that TE "sabotaged" Fortis's attempt to sell the entire Portfolio (a patently absurd allegation given that TE was actively trying to sell the Portfolio and stood to earn a substantial commission from the sale), and that TE committed "numerous material breaches of the Agreement." Fortis Compl. ¶ 23. These alleged material breaches were barely described in the initial Complaint. Fortis claimed simply that "Truitt breached [the December 2000 Agreement] on multiple occasions by purchasing a substantial number of tax liens with 'face value yields' of less than the stated minimum." Fortis Compl. ¶ 33. The December 2000 Agreement included a guideline for purchasing TLCs with certain expected "face value yields," a formula linked to the prevailing yields on the two-year sequential

collateral mortgage obligation at the time of purchase of a TLC. *See* Compl. Ex. A, at ¶ 6. The face value yield is merely a guideline because in most jurisdictions the yield cannot be calculated precisely until the TLC is redeemed. Fortis's termination letter and Complaint did not explain what liens were the subject of its allegations, or why it was suddenly concerned about the yield rate guideline. Fortis had received all data necessary to calculate yield rates for years, but it never complained that rates failed to meet contractual guidelines. In an Amended Complaint, Fortis alleged "material breaches" of other sections of the December 2000 Agreement, again without providing details – which it was not obliged to do in a Complaint, but which it certainly must provide in response to valid discovery requests.

As Fortis's initial Complaint established, moreover, Fortis did not even begin investigating the basis of its claim for "material breaches" by TE until February 2003, when it became clear that TE intended to enforce its right to purchase liens for Fortis's account. As Fortis expressly alleged in its initial Complaint:

> Truitt's announced intention to purchase additional tax liens [in the February 2003 Notice of Breach letter] prompted Fortis to review the composition of the Portfolio against the requirements of Section 2 of the [December 2000] Agreement. Its investigation was telling: Truitt had purchased a significant number of tax liens . . . which yielded, on their face, significantly less than the "minimum face yield" of 425 basis points over the hurdle rate.
>
> As a result of Truitt's numerous material breaches of the Agreement, on or about February 14, 2003, [Fortis] terminated the [December 2000] Agreement . . . .

Fortis Compl. ¶¶ 22-23.

These paragraphs establish that Fortis began searching for a way to terminate the December 2000 Agreement in February 2003, *after* TE warned Fortis that its failure to fund

5

purchases up to the $35 million limit was a breach of the Agreement. Fortis terminated the contract and filed a lawsuit within a few days of (allegedly) beginning its "investigation." TE strongly believed at the time, and it continues to believe today, that Fortis had no evidence that TE committed a material breach of the December 2000 Agreement, and that Fortis drafted and filed a Complaint solely to force TE to litigate its own claims in an inconvenient forum. Since filing its Complaint, Fortis has been attempting to find technical problems with certain TLCs so it can claim that it properly terminated the Agreement in February. TE, in turn, is attempting to determine the basis for Fortis's claims through discovery. Fortis's complete failure to provide any substantive information about its "investigation" – and virtually every allegation of its own Counterclaim – prompts this motion to compel.

## ARGUMENT

**A. The Court Should Order Fortis To Submit Complete Responses To Interrogatories.**

TE served interrogatories that sought, among other things, the basis for Fortis's claim that TE had committed "numerous material breaches" of the December 2000 Agreement. Fortis's responses are utterly devoid of substance and they reveal that even eight months after filing suit, Fortis still has not conducted a proper investigation of the Complaint it hastily filed in New Jersey. *See* Ex. 1. In fact, Fortis completely refused to respond to 20 of the 24 interrogatories, even though the bulk of the interrogatories asked for Fortis to explain the allegations of its own Complaint. To take one representative response:

> Interrogatory No. 3.  Please identify with particularity each material breach of the December 2000 Agreement that you allege Truitt Enterprises committed.

> Response No. 3.  Defendants object to this interrogatory as premature.  The material breaches of the December 2000 Agreement are set forth generally in Defendants' pleadings.

Ex. 1, at 3.  Other interrogatories seek information on alleged breaches of fiduciary duty (No. 4); alleged wrongful acts (No. 5); Fortis's damages (No. 6); communications related to the December 2000 Agreement and the Commission Agreement (Nos. 7 and 8); complaints communicated by Fortis about Truitt's performance (No. 9); communications about the potential sale of the Portfolio (No. 10); communications about Fortis's consideration of replacing Truitt as Portfolio servicer (No. 11); the facts related to Fortis's decision to reject Truitt's purchase of TLCs (No. 12); facts surrounding Fortis's decision to terminate the Agreement (No. 13); communications related to Truitt's intention to bid on properties in early 2003, which Fortis rejected (Nos. 14 and 16); communications related to Fortis's decision to liquidate the Portfolio (No. 15); communications with the party whose bid TE allegedly "sabotaged," (Nos. 17, 18); facts supporting Fortis's claim that TE purchased TLCs below the "minimum face value yield," and the other "breaches" Fortis alleged generally in the Amended Complaint (Nos, 19, 20, 21, 22, 23); and admissions against interest (No. 24).

There is no point in reprinting and analyzing each of these responses one by one under Local Rule 104.8.a, because there is nothing to analyze.  Fortis objected to twenty-two consecutive interrogatories, and it provided no substantive information whatever in response to twenty of those twenty-two.[1]  TE has attached the interrogatories and Fortis's responses *in toto*.  That attachment

---

[1] The two responses that may require brief individual attention are Nos. 4 and 20. Interrogatory No. 4 requested that Fortis "identify with particularity any fiduciary duty that you allege that Truitt Enterprises or James F. Truitt, Jr. breached."  The response states (after an objection): "Truitt Enterprises' fiduciary duties arose from its agency relationship with [Fortis] and James F. Truitt's fiduciary duties arose from his status as attorney for [Fortis]."  This response is

readily establishes that the questions are relevant, and the responses are totally devoid of substance. TE requests an Order compelling Fortis to provide complete responses to Interrogatory Nos. 3 through 24.

Fortis's only defense for its inadequate responses appears to be a claim that it will supplement some of its responses – it is not clear which – after it completes its "analysis."[2] After receiving Fortis's responses, TE's counsel promptly wrote to Fortis's counsel demanding full and complete responses to the Interrogatories. *See* Ex. 2. TE's counsel called Fortis's responses "among the worst I have ever seen." Fortis's counsel responded that TE's letter was

> long on rhetoric but short on substance. Truitt repeatedly violated key provisions of the relevant contract. Indeed, it is the massive scope of those violations that prevents comprehensive responses [to

---

inadequate because it fails to explain with particularity the circumstances of the alleged breach; it merely states the legal basis for the fiduciary duty.

Interrogatory No. 20 requested that Fortis "describe all facts and state the substance of all communications, whether oral or written, relating to your allegation that '[i]n Indiana Truitt failed to perform adequate examinations of the public records to ascertain persons with a substantial interest in the subject properties and incurred unnecessary postage expenses in the notice process,' and '[a]s a result American Bankers has incurred substantial duplicate expenses to correct Truitt's errors.' . . ." Fortis objected to this interrogatory, but then added that TE (allegedly) failed to comply with certain specified Indiana statutes and that Fortis had to pay another attorney to correct these alleged deficiencies. The response is inadequate because it fails to identify any particular deficiency – TE denies that it failed to comply with these statutes, and without the underlying facts it cannot evaluate Fortis's claims – and it does not identify any documents that would describe the alleged deficiencies. If TE had the relevant documents it could perhaps assemble this information itself, but upon first review of Fortis's document production TE did not discover any relevant documents. In addition, the response fails to itemize or provide any facts relevant to the payments made to the replacement attorney.

[2] Fortis objected to a number of interrogatories as "overbroad" and "unduly burdensome," but never explained why. *Compare Tucker* v. *Ohtsu Tire & Rubber Co.*, 191 F.R.D. 495, 498 (D. Md. 2000) (party alleging that a discovery request is unduly burdensome "must allege specific facts that indicate the nature and extent of the burden, usually by affidavits or other reliable evidence").

8

> the] interrogatories at this time. When we have concluded our analysis, we will promptly supplement defendants' interrogatory responses as appropriate.

Ex. 3. In telephone conversations between counsel, Fortis claimed that TE knew what it did wrong, and therefore TE was not prejudiced by Fortis's failure to provide substantive responses to TE's interrogatories.

Fortis's position is a clear violation of the purpose and spirit of federal discovery procedure and, if permitted, it would severely prejudice TE's attempts to prepare for trial. As Judge Grimm has explained,

> Because interrogatory answers frequently serve as the foundation for additional discovery by way of depositions, document production requests and requests for admissions of fact, interrogatories are most helpful when propounded and answered early in the litigation, and their usefulness seems to be directly proportional to the amount of time remaining before a discovery cutoff arrives. If a party served with interrogatories fails to answer them on time, or at all, or fails to answer the questions completely and responsively, such action can have a spiraling effect on the future scheduling of discovery, and inject into the litigation collateral disputes which typically require the intervention of the court to resolve. Thus, for interrogatories to work as intended by the drafters of the rules of civil procedure, it is essential that counsel who receive them act with diligence and good faith, and submit timely, responsive and complete answers.

*Jayne H. Lee, Inc.* v. *Flagstaff Indus. Corp.*, 173 F.R.D. 651, 653 (D. Md. 1997) (footnote omitted).

The Scheduling Order in this case requires TE to identify experts and serve expert reports on October 8, 2003. Discovery closes on December 22, 2003, and depositions are currently being scheduled for late October and November. TE served its interrogatories at the outset of discovery so it could determine just what Fortis now claims TE did wrong in managing the Portfolio. TE firmly believes that its performance was superb; that Fortis greatly benefitted from its

relationship with TE; and that Fortis is now searching for technical deficiencies among the thousands of TLCs that TE purchased and sold for Fortis's account over the course of several years. The point is that TE needs to know what deficiencies Fortis is alleging – however meaningless or trivial – so TE can prepare its defense by consulting with expert witnesses, by asking appropriate questions at the depositions of fact witnesses, and by preparing its own witnesses for deposition.

Fortis has no right to withhold the facts in support of its claim on grounds that it has not completed its investigation. Significantly, the evidence Fortis has *now*, as well as the evidence it had in February 2003 when it terminated the Agreement, is highly relevant to Fortis's claim that it properly terminated the Agreement. TE contends, among other things, that Fortis had no valid basis for terminating the Agreement in February 2003, and that Fortis only did so because it wanted to end the relationship with TE for other reasons. Knowing that it would be required to pay substantial damages to TE for terminating the Agreement, Fortis claimed that it had a contractual right to terminate the Agreement based on "material breaches," and *then* Fortis started looking for material breaches. TE believes that Fortis is trying to hide its lack of evidence of any material breach in February until it can bolster its own claim. But if Fortis had no right to terminate the Agreement when it did so, then TE was harmed by Fortis's early termination. And Fortis's lack of evidence of a material breach when it terminated the Agreement is highly relevant to TE's claim that Fortis's termination was not predicated on any "breach" that the parties reasonably would have considered material.

Moreover, Fortis chose to file a lawsuit. The Federal Rules require parties who file a lawsuit to conduct a reasonable investigation. As the Court of Appeals for the Fourth Circuit has observed, "the processes of litigation presuppose some reasonable investigation before the filing of

a complaint." *Hess Mechanical Corp.* v. *NLRB*, 112 F.3d 146, 150 (4th Cir. 1997). Eight months have passed since Fortis filed its Complaint, and Fortis still refuses to disclose any relevant facts supporting its claims. TE cannot prepare its case on Fortis's time schedule, and it has no obligation to do so.

## CONCLUSION

For these reasons, the Court should enter an Order compelling a complete response to Interrogatory Nos. 3 through 24. In addition, because Fortis's failure to respond is so egregious, the Court should order Fortis to pay the reasonable expenses plaintiffs have incurred in pursuing this motion, including attorney's fees, as contemplated by Rule 37(a)(4).

Dated: September 29, 2003                    Respectfully submitted

                                             MURPHY & SHAFFER LLC


                                             By: /s/ *John J. Connolly*
                                                 William J. Murphy (00497)
                                                 John J. Connolly (09537)

                                             36 S. Charles St., Suite 1400
                                             Baltimore, Maryland 21201
                                             (410) 783-7000

                                             *Attorneys for Plaintiffs*